# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

JOEL MARVIN MUNT,                                    Case No. 19-CV-1142 (NEB/ECW)

               Plaintiff,

v.                                                   **ORDER AND**
                                                     **REPORT AND RECOMMENDATION**

PAUL SCHNELL, DAVID REISHUS,
SHERLINDA WHEELER, BRONSON
AUSTRENG, GRAHAM BESONEN,
NICK DESETELLE, LINDSEY
MOSSER, PARKER, and WITTER,

               Defendants.

This matter comes before the Court on (1) Plaintiff Joel Marvin Munt's First

Amended Civil Rights Complaint (Dkt. 11 ("Amended Complaint")); (2) Munt's filing

titled "Supplement to TRO Request" (Dkt. 20 ("TRO Supplement")); (3) Munt's First

Motion for Expedited Temporary Restraining Order Pursuant to Fed. R. Civ. P. 65(b)

(Dkt. 22 ("TRO Motion")); (4) Munt's Amended First Motion for Expedited Temporary

Restraining Order Pursuant to Fed. R. Civ. P. 65(b) (Dkt. 25 ("Amended TRO Motion"));

(5) Munt's Motion to Accept Amendment (Dkt. 36 ("Motion to Amend")); (6) the

Motion to Dismiss filed by Defendants Paul Schnell, David Reishus, Sherlinda Wheeler,

Bronson Austreng, Graham Besonen, Nick Desetelle, Lindsey Mosser, "Parker," and

"Witter" (Dkt. 42 ("Motion to Dismiss")); (7) Munt's filing titled "Requests of the Court"

(Dkt. 56 ("First Court Requests")); (8) Munt's filing titled "Request for Court Actions

#2" (Dkt. 67 ("Second Court Requests")); (9) Munt's Motion to Strike Defendants' Reply in Support of the Motion to Dismiss (Dkt. 75 ("Motion to Strike")); and (10) Munt's filing titled "Motion for Sanctions #2" (Dkt. 77 ("Sanctions Motion")).

For the following reasons, the Court (1) recommends that the Motion to Dismiss be granted in part and denied in part; (2) recommends that the requests for a temporary restraining order ("TRO") in the TRO Supplement, TRO Motion, and Amended TRO Motion be denied; (3) recommends that the Sanctions Motion and the requests for sanctions in the First Court Requests and Second Court Requests be denied; and (4) denies the Motion to Amend, the motion for stay in the Second Court Requests, and the Motion to Strike.

For ease of explication, the Court will proceed as follows. First, it will discuss this case's background; in roughly chronological order, this section will discuss the Amended Complaint's allegations and recount the history of this action's pending requests and motions. Second, the Court will address certain requests and motions best handled before addressing the Motion to Dismiss. Third, the Court will resolve the Motion to Dismiss itself. Finally, the Court will turn to Munt's various requests for a TRO.

## I.    BACKGROUND

### A.    Amended Complaint

Munt commenced this action in April 2019 by filing his original Civil Rights Complaint. (*See* Dkt. 1.) He filed the Amended Complaint on July 17, 2019. (*See* Dkt. 11.) In an order dated July 30, 2019, the Court accepted the Amended Complaint as this action's operative pleading. (*See* Dkt. 12 at 2.)

## 1.    Parties

When Munt filed the Amended Complaint, he was a prisoner incarcerated at the Minnesota Correctional Facility in Oak Park Heights, Minnesota ("MCF-OPH"). (*See* Dkt. 11 at 4.)[1]  The Amended Complaint names nine defendants, all affiliated with MCF-OPH in some way.  (*See id.* at 1, 4-11.)  Paul Schnell is the State of Minnesota's commissioner of corrections.  (*See id.* at 6.)  David Reishus is MCF-OPH's acting warden and Sherlinda Wheeler is its assistant warden of operations.  (*See id.* at 6-8.) Bronson Austreng is MCF-OPH's program director.  (*See id.* at 8.)  Graham Besonen and "Witter" are lieutenants at MCF-OPH, Nick Desetelle is a sergeant assigned to MCF-OPH's "Complex 3,"[2] and Lindsey Mosser and "Parker" are MCF-OPH corrections officers.  (*Id.* at 9-11.)

## 2.    Points Concerning Amended Complaint Interpretation

Before discussing the Amended Complaint's allegations, the Court will make two observations about how it construes the pleading.  First, at various points in the Amended Complaint, Munt refers to numerous other lawsuits he has filed.  (*See, e.g.*, *id.* at 12, 15-22.)[3]  These references are a problem because a complaint should be a standalone

---

[1]    Citations to court filings use the page numbers provided by the Court's CM/ECF filing system.

[2]    As the Court understands it, Munt was housed within Complex 3 when he filed the Amended Complaint.  (*See* Dkt. 11 at 12.)

[3]    The Amended Complaint's footer refers to this action as "Suit #9," and the Amended Complaint's allegations indicates that a tenth action exists as well.  (*See id.* at 12 (referring to "Suit[s] #5, 6, 7, and 10").)

document.  *See Spears v. McCraw*, No. A-17-CA-1105-RP, 2019 WL 3754218, at *4
(W.D. Tex. Aug. 8, 2019)  ("A properly pleaded complaint must give 'fair notice of what
the claim is and the grounds upon which it rests.'  *Ashcroft v. Iqbal*, 556 U.S. 662, 698-99
(2009).  Spears' references to the complaints in other actions fail to do so, thereby
rendering improper any reliance on the allegations pleaded therein.")  Indeed, this Court
warned Munt early in this litigation—before he filed the Amended Complaint—that
"[t]he requirement of a unified pleading provides to all parties (and the Court) a single
document in which all relevant factual allegations and legal claims have been included,
thus defining the scope of the litigation," and that "[a] 'pleading' scattered across several
documents defeats that purpose."  (Dkt. 9 at 2.)  The Court has not—and will not—sift
through Munt's various other matters to flesh out this action's allegations.  As a result,
the Court (as best as it can) construes the Amended Complaint as an independent
document.

Second (and relatedly), toward the end of the Amended Complaint's factual
allegations, Munt makes various statements described as a "sequence of facts . . . largely
regarding matters and defendants from other suits."  (Dkt. 11 at 20.)  He says that "[t]hey
are relevant . . . to prove Mosser's acts (which are relevant to this suit) are not isolated,"
and that they "show distinct protected acts and a cluster of acts by staff, including
continuation and escalation of the retaliation at issue here as well as a broadening of it."
(*Id.*)

These allegations refer at certain points to Munt's other cases.  (*See, e.g., id.* at 20-
22.)  As noted before, the Court will not look through Munt's other cases to learn how

4

they concern Mosser.  Nor will the Court review Munt's other complaints to see if their allegations give rise to causes of action when one reads those complaints alongside the Amended Complaint.  The Court will take Munt's own characterization of the purpose of these allegations at face value, and will assess these allegations only for the limited purpose of considering whether Mosser's alleged actions are part of a conduct pattern.

### 3.    Factual Allegations

With this backdrop in place, the Court will lay out the Amended Complaint's allegations in some detail.[4]  As a general matter, Munt describes this action as seeking relief for "various actions taken by Defendants to retaliate against [Munt] for his use of the grievance process and for collecting evidence for his court actions."  (Dkt. 11 at 4.) Munt states that Defendants Besonen, Desetelle, Mosser, Parker, and Witter "deliberately and maliciously retaliated and conspired to retaliate against [Munt]."  (*Id.*)  As for the remaining Defendants, Munt claims that they "permitted this to occur and to continue, tacitly approving of and maintaining the culture of retaliation within the DOC [i.e., the Minnesota Department of Corrections ('MNDOC')]."  (*Id.*)

After briefly introducing the parties (*see id.* at 6-11), Munt begins his "Statement of Facts" by stating that "[p]olicy"—presumably MNDOC policy—"permits staff unfettered discretion within their areas."  (*Id.* at 11.)  He alleges that MNDOC "[p]ractice has superiors in the chain of command devoted to turning a blind eye to, justifying or

---

[4]    Because the Court is denying the Motion to Amend (*see* Sections I.C, II.A *infra*), this discussion does not detail the allegations that Munt seeks to add to this action in his proposed Second Amended Civil Rights Complaint (Dkt. 36-1 ("Second Amended Complaint")).

covering up unconstitutional conduct by staff, rather than doing anything to correct it."
(*Id.*)  He also states that "customs of interfering with court access and retaliating against any exercise of their rights by inmates are encouraged and supported at all levels within the DOC."  (*Id.*)

The specific events covered in the Amended Complaint begin with Munt's "second stay" at MCF-OPH.  (*Id.* at 12.)  Munt alleges that "[a]lmost from the start of" this "second stay," he had "problems with Besonen"—indeed, Munt suggests that some of his concerns with Besonen's conduct are part of a separate "Suit #7."  (*Id.*)[5]  Early on during his second MCF-OPH stint, Munt alleges that he learned of a (false) rumor that MNDOC officials had transferred him to MCF-OPH because he was being extorted at the Minnesota Correctional Facility in Stillwater, Minnesota ("MCF-Stillwater").  (*See id.*)[6]

With respect to his interactions with corrections officers ("COs"), Munt states that he found them "pretty decent," save for some "initial problems" with Parker.  (*Id.*)  Munt alleges that "[a]t some point," however, he asked for certain "video" that he thought would help with another lawsuit.  (*Id.*)  The response from management, he claims, provided "far more valuable evidence for [that] suit, which is what [Munt] had hoped."

---

[5]    Munt's allegations about Besonen here illustrate the problems the Amended Complaint's reliance on his other actions.  With respect to Besonen, Munt alleges that "[h]e [Munt] has grieved issues over notary services, supervision of staff, failure to respond to kites and participation in other retaliatory conspiracies which are the subject of multiple suits."  (*Id.*)  As stated previously, the Court will not import other suits' allegations into this action; the Court thus views Munt's allegations here as merely indicating that he has had prior run-ins with Besonen.

[6]    Munt does not allege any particular individual's involvement with this rumor. (*See id.*)

(*Id.*)  After making the request, Munt contends, Witter "met with [Munt] and threatened retaliation because of it."  (*Id.* at 13.)  Soon afterward, "Desetelle, Mosser and Parker became extremely hostile towards [Munt] and began treating [him] disparately from other inmates."  (*Id.*)

Munt also asserts that Witter, Desetelle, Mosser, and Parker told "one of their pet inmates" about Munt's video request; this inmate allegedly provides information to COs, "goes on missions for them," and "receives preferential treatment for his efforts."  (*Id.*) This inmate became "hostile towards [Munt] and talked to others about" Munt's request. (*Id.*)  The inmate also began spreading rumors about Munt, including that he "had a sex case."[7]  (*Id.*)  As this rumor circulated, Munt wrote to Besonen twice about "hostility and retaliation by his staff, including the rumors," telling him that he (Munt) thought that the hostility was due to Munt's evidence request.  (*Id.*)  Munt states that, while he received no response from Besonen, the conduct of Desetelle, Mosser, and Parker improved.  (*See id.* at 14.)

Sometime later, the "pet inmate" began spreading other rumors about Munt.  (*See id.*)  These included rumors that Munt had been in some sort of relationship with a female CO at MCF-Stillwater, that he was a racist, and that he was writing "kites" (i.e., complaints) about not just corrections staff, but also inmates.  (*See id.*)  When confronted

---

[7]     The Court construes this to mean that the inmate told others that Munt was incarcerated for a sexual offense.  Munt states, with respect to this rumor, that "[f]ortunately people know me and my case is easily verifiable for those who don't know me."  (*Id.* at 13.)  The Court understands this to mean that other prisoners knew that, notwithstanding the "pet inmate's" rumors, Munt had not been imprisoned for a sexual offense.

about the rumors, the "pet inmate" allegedly "tried to justify his actions by admitting that he was [spreading the rumors] on order from Desetelle and Mosser, who had been ordered to try to get [Munt] messed up by Besonen because of the kites [Munt] was writing about him." (*Id.*)[8] Munt notes, however, that while "such physical assault was the intent of Besonen, Desetelle, and Mosser," "[n]one of Defendants' efforts resulted in [Munt] being physically harmed and there is no danger of this occurring . . . ." (*Id.*)

At some point, Munt wrote a "third kite" to Besonen; this one discussed his staff's actions and the claim that Besonen himself had allegedly ordered those actions. (*Id.*) Besonen did not respond to this kite, and so Munt apparently communicated his concerns to Austreng and Wheeler. (*See id.* at 14-15.) Austreng reportedly asked Besonen about these allegations, then responded to Munt that his concerns "were unfounded." (*Id.* at 15.) Wheeler, who also allegedly asked Besonen about Munt's claims, then told Munt to "watch his own conduct." (*Id.*)

More generally, Munt states that Defendants "lacked a legitimate reason for treating [Munt] differently and more adversely than other inmates." (*Id.*) Aside from certain Defendants' involvement with the rumors discussed above, this different treatment is not specified, but Munt does say that "Desetelle and Parker often single [Munt out] for adverse action where they do not bother other inmates and fully approve of actions of their favorites." (*Id.*)

---

[8]     As to the rumor that Munt was filing kites about fellow inmates, Munt says it was "harder to counter," but that "enough people kn[e]w of [Munt's] legal activities, his principles, and staff's long history of retaliation to squash it." (*Id.* at 14.)

In March 2019, Munt wrote to Schnell, discussing "in detail" the alleged retaliation against Munt "as well as the culture of retaliation in general." (*Id.*) This communication with Schnell was apparently reported to Austreng, Wheeler, and Reishus. Austreng purportedly responded by speaking only with Besonen, then claiming that "none of [Munt's] claims [had] been substantiated." (*Id.*) Munt characterizes this as Austreng "turn[ing] a blind eye" to other Defendants' retaliatory conduct. (*Id.* at 16.) Similarly, Wheeler "merely talked to the perpetrators and then concluded that there was no evidence they are retaliating or spreading rumors or information." (*Id.*)[9] Munt contends that, in contrast, Reishus's response to Munt's accusations "was more insidious"—that he used unspecified "flaws" in the prison's grievance system "to frustrate [Munt's] use of [that] system." (*Id.*)[10]

---

[9]    Munt seems to suggest that any competent investigation of his retaliation allegations would have uncovered evidence supporting his claims. Munt points here to (1) the "pet inmate" knowing things that only MCF-OPH staff should have known; (2) admissions by the inmate implicating certain Defendants in encouraging him to start rumors about Munt; and (3) video evidence and inmate testimony that would establish that the "pet inmate" often socialized with Desetelle, Mosser, Parker, and other COs. (*Id.* at 16.)

[10]    The Court describes the flaws as "unspecified" because the Amended Complaint does not describe the relevant alleged "flaws." Instead, Munt refers the Court to his "Suit #7," *Munt v. Schnell*, No. 19-CV-0056 (JNE/SER) (D. Minn.). (*See id.* at 16, 28.) As previously stated, the Court will not hunt through other cases to assemble Munt's causes of action here, so when this Court addresses Defendants' Motion to Dismiss below, the Court will consider only those allegations against Reishus that are actually fleshed out in the Amended Complaint itself. Furthermore, the Court notes that whatever flaws Munt pointed to in No. 19-CV-0056, the court there dismissed that suit with prejudice following the defendants' motion to dismiss, and the resulting order contained a filing restriction preventing Munt from filing new legal actions in this District unless he is represented by counsel or gets prior court approval. *See, e.g.*, Order 1-2, *Munt v. Schnell*, No. 19-CV-0056 (JNE/SER) (D. Minn. May 5, 2020).

Meanwhile, Besonen, Desetelle, and Mosser allegedly developed a plan to spread more rumors about Munt "in an effort to get him assaulted for the kites he was writing about Besonen." (*Id.* at 17.)  In addition, Witter learned about a second, separate request Munt made "to obtain video evidence for a court case," and told other MCF-OPH staff about the request.  (*See id.*)  After Besonen, Desetelle, and Mosser learned of the new request, they "became hostile and began targeting [Munt] for negative treatment"; they also allegedly targeted "those with [Munt]."  (*Id.*)  Witter also personally threatened Munt "over the request, in an attempt to chill [Munt's] exercise of his rights."  (*Id.*)

Munt states that, as a general matter, Defendants' retaliatory acts prevent him from getting a job he seeks as a "CX3 swamper."  (*Id.*)  He also asserts that all MCF-OPH staff members (save one) are hostile to him, either by "[being] a party to retaliation or [turning] a blind eye to it."  (*Id.*)

Finally, Munt presents a series of allegations about conduct in May and June 2019.  (*See id.* at 18-20.)  In May 2019, the "inmate agent" began spreading new rumors about Munt, including that Munt (1) made "defamatory statements" about a female CO at MCF-Stillwater, (2) is a "woman hater," (3) threatened the relevant female CO, and (4) is gay.  (*Id.* at 18.)  Munt contends that all of these rumors are false.  (*See id.*)  Munt suggests that this inmate was spreading these rumors on Mosser's behalf, and that "[u]nit video can corroborate the inmate agent's extensive past and continuing contact with the conspirators, especially Mosser."  (*Id.*)  Munt also states that on May 30, 2019, and June 19, 2019, the "inmate agent" engaged in conduct "disrespecting [Munt] and otherwise attempting to provoke a fight."  (*Id.* at 20.)

### 4.    Causes of Action

Munt claims that Defendants Desetelle, Mosser, and Parker "treated [Munt] in a hostile manner" because of his "kite" requesting evidence for a court case, and conspired with Besonen to "try to get Munt assaulted in retaliation for [Munt's] use of the grievance system." (*Id.* at 23-24.) Munt claims that this conduct violates his "right to be free from retaliation and his right to equal protection." (*Id.* at 23.) Given these statements, the Court construes Munt as raising a First Amendment retaliation claim and a Fourteenth Amendment equal protection claim against Besonen, Desetelle, Mosser, and Parker. The Court also construes Munt as claiming that these Defendants conspired to infringe on Munt's constitutional rights.

Munt states that Defendants Reishus, Wheeler, and Austreng have "tacitly approved of the retaliatory acts of the Defendants by failing to correct them and turning a blind eye to those acts and the culture of retaliation that caused them." (*Id.* at 24.) As for Schnell, Munt alleges that he "has permitted the culture of retaliation in the [MNDOC] to continue and has made no efforts to end it." (*Id.*) Treating the Amended Complaint liberally—as the Court must, given Munt's status as a pro se litigant, *see Topchian v. JPMorgan Chase Bank, N.A.*, 760 F.3d 843, 848 (8th Cir. 2014) (citing *Estelle v. Gamble*, 429 U.S. 97, 106 (1976))—the Court construes Munt as raising a First Amendment retaliation claim and a conspiracy claim against these four Defendants.

Finally, Munt states that Witter "threatened retaliation against [Munt] due to [his] request for evidence for a court case" and told others about Munt's request, purportedly causing Desetelle, Mosser, and Parker to act adversely toward Munt. (*Id.*) The Court

construes these allegations as raising a First Amendment retaliation claim and a conspiracy claim.

In summary, then, the Court construes the Amended Complaint as asserting (1) First Amendment retaliation claims against all Defendants, (2) conspiracy claims against all Defendants; and (3) Fourteenth Amendment equal protection claims against Desetelle, Mosser, and Parker.

### 5.    Requests for Relief

The Amended Complaint's request for relief has four subparts.  (*See id.* at 25-29.) First, Munt seeks a variety of declaratory relief—mostly declarations that Munt has prevailed on his various causes of action.  (*See id.* at 25-26.)  He also seeks a declaration that "inmates constitute a vulnerable class who are vulnerable to the [actions] of corrections staff."  (*Id.* at 26.)

Second, Munt seeks certain injunctive relief, including an order that "all adverse acts by Defendants against [Munt] end immediately."  (*Id.*)  He also seeks orders (1) indicating that any further retaliation toward him will lead to contempt charges subjecting the offenders to a monetary fine and/or prison; (2) requiring the MNDOC to fire Besonen, Desetelle, Mosser, and Parker, or at least transfer them to other facilities; and (3) barring Defendants from transferring Munt to another facility unless they "establish that the transfer was not in fact motivated by impermissible factors."  (*Id.* at 26-27.)

Third, Munt asks that Defendants be held jointly and severally liable for $100,000 in compensatory damages and $1 million in punitive damages.  (*See id.* at 27-28.)

Finally, Munt asks for various measures of "misc[ellanous]" relief.  (*Id.* at 28-29.)

These include reimbursement of Munt's litigation costs, as well as appointment of "a

court monitor" if "there [is] less than full compliance with" any court orders issued due to

this litigation.  (*Id.* at 29.)

## B.    TRO-Related Motions

On September 25, 2019, the Court received Munt's TRO Motion; it had actually

received the TRO Supplement two days earlier.  (*See* Docket.)  Review of these materials

shows that Munt signed and dated the TRO Motion on September 18, 2019, and signed

and dated the TRO Supplement on September 19, 2019.  (*See* Dkt. 20 at 3; Dkt. 22 at 15.)

The Court thus construes the TRO Supplement as being a supplement to the TRO

Motion.

The Court received Munt's Amended TRO Motion on September 27, 2019; Munt

signed and dated this filing on September 24, 2019.  (*See* Dkt. 27 at 17.)  The Court

understands the Amended TRO Motion to supersede the original TRO Motion; the

amended motion is plainly an edited and supplemented version of the earlier document.

(*Compare* Dkt. 22, *with* Dkt. 25.)

The Amended TRO Motion seeks wide-ranging relief against the MNDOC, and

against Defendants Mosser and Parker.  In relevant part, Munt asks the Court to:

- "Prohibit the [MNDOC] and those acting on its behalf from punishing or harassing [Munt] in any way in retaliation against this suit."  (Dkt. 25 at 5.)

- "Prohibit the [MNDOC] from transferring Plaintiff (whether to a different facility or a different unit) or otherwise taking anything that

13

may be construed as an adverse action against him as its 'solution' to [Mosser's and Parker's] behavior." (*Id.*)

- "Warn the [MNDOC] that there will be the presumption that if these things occur that they were done in retaliation for this suit." (*Id.*)

- "Order [MNDOC] staff to not intimidate or otherwise attempt to sway the testimony of witnesses in this case . . . ." (*Id.*)

- Order that "[a]ny officials who take any actions will be held in contempt . . . ." (*Id.* at 6.)

- "Grant a Restraining Order that Officers Mosser and Parker not be permitted within 1000 yards of [Munt] outside of a court or depositional setting . . . and requiring that [they] cease all of [their] activities against [Munt] . . . ." (*Id.*)

- "Grant a Restraining Order that Officers Parker and Mosser not have any contact with Mosser's inmate [i.e., the 'pet inmate'], directly or indirectly, nor with any other inmates or staff who may be a witness in this action." (*Id.*)

### C.  Motion to Amend

Munt filed the Motion to Amend on October 21, 2019.  The Motion asks the Court to accept Munt's Second Amended Complaint, attached as an exhibit.  (*See* Dkt. 36 at 1; *see also* Dkt. 36-1 (presenting proposed pleading).)  The Motion to Amend also asks the Court for a "standing order" allowing Munt to "keep the Court apprised of new facts" regarding his claims.  (Dkt. 36 at 2.)

### D.  Motion to Dismiss

Defendants filed the Motion to Dismiss on October 28, 2019.  (*See* Dkt. 42 at 1.) The Court will address its arguments in more detail below; for now it suffices to say that the Motion to Dismiss asks the Court to dismiss the entire Amended Complaint based on Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).  (*See, e.g.*, Dkt. 43 at 1-2, 22.)

14

### E.     First Court Requests

The Court received Munt's First Court Requests on November 8, 2019.  (*See* Dkt. 56 at 1, 7.)  These asked for several things, and the Court resolved most of the requests in its Order dated December 12, 2019.  (*See* Dkt. 70 at 5.)  The only outstanding request is Munt's request that the Court impose sanctions on Defendants.  (*Compare* Dkt. 56, *with* Dkt. 70 at 5; *see also* Dkt. 56 at 6-7 (containing sanctions request).)

Munt's November 2019 sanctions request is one paragraph long and asserts that "Defendants have used knowledge" of his filings—specifically, his request for a TRO, a discovery request, and a draft version of the Amended Complaint—"as motivation for retaliation." (Dkt. 56 at 6.)  Munt says that he "leave[s] it up to the Court as to the proper steps to take," but expresses concern about his ability to proceed with this litigation.  (*Id.* at 7.)

### F.     Second Court Requests

On December 9, 2019, the Court received Munt's Second Court Requests.  (*See* Dkt. 67 at 1.)  This document states, among other things, that in November 2019, MNDOC staff transferred Munt from MCF-OPH to the Minnesota Correctional Facility in Rush City, Minnesota ("MCF-Rush City").  (*See id.* at 1-2.)  Munt claims that Defendants learned that he was trying to secure affidavits in support of his TRO request, and that his transfer to MCF-Rush City was in retaliation for that work.  (*See id.* at 2.)  Munt further asserts that during this transfer, he was deprived of "the bulk of his property, including critical legal papers." (*Id.*)

15

Munt makes various requests purportedly to remedy the transfer's effects.  (*See id.* at 2-7.)  First, he asks the Court to stay this litigation "until [he] is moved back to OPH and *all* of [his] property [is] returned."  (*Id.* at 2-3 (emphasis in original).)  Second, Munt asks for various forms of sanctions—specifically, that the Court (1) order Defendants to return Munt to MCF-OPH "immediately," return his property, "compensate" him "for any duplicated or lost property, and "restore him" to the job he had previously held at MCF-OPH; (2) enter judgment in Munt's favor on all claims if "any legal materials . . . are not returned"; and (3) give Munt leave to "amend his Complaint to include these latest retaliatory acts."  (*Id.* at 4-5, 7.)

### G.    Motion to Strike

Defendants filed their reply in support of the Motion to Dismiss on January 2, 2020.  (*See* Dkt. 74 at 1.)  Of particular note, while discussing Munt's conspiracy claims, the reply contains a footnote stating, *inter alia*, that "[i]t should also be noted that Munt is no longer housed at MCF-OPH, which not only removes him from the alleged harm he alleges **but also moots his claims**."  (*Id.* at 6 n.1 (emphasis added).)  It also states: "Munt is no longer housed at MCF-OPH and so, his claims for equitable relief are moot."  (*Id.* at 11 n.6.)  As the Court understands it, these references concern Munt's November 2019 transfer from MCF-OPH to MCF-Rush City.

Munt filed the Motion to Strike on January 30, 2020.  (*See* Dkt. 75 at 1.)  The gravamen of the Motion to Strike is that various arguments in Defendants' reply in support of the Motion to Dismiss are inappropriate, and so the Court should strike the reply "in part or in whole."  (*Id.* at 10.)  Of particular note, Munt claims that Defendants'

reply argued that Munt's claims were moot, that this was not an appropriate argument for a reply, and that this Court should not deem any of Munt's claims moot unless he gets a chance to respond. (*See id.* at 3, 5, 10.)

### H.    Sanctions Motion

Munt filed the Sanctions Motion with the Motion to Strike. (*See* Dkt. 77.) Munt's key contention is that in pre-November 2019 filings, Defendants and their counsel told this Court that Munt's concerns about being transferred to another facility were speculative. (*See id.* at 2.) Because a transfer in fact did happen in November 2019, Munt suggests, Defendants' counsel "has proven themselves complicit in . . . misconduct" meriting sanctions. (*Id.* at 1.) For relief, Munt suggests that this Court grant "[j]udgment in [his] favor"—or, in the alternative, that the Court deny the Motion to Dismiss, grant the Motion to Amend, and grant Munt leave to file another amended complaint adding new retaliation allegations. (*Id.* at 4.)

## II.    ANALYSIS

In the Court's view, analyzing the pending motions will proceed best by considering them somewhat out of chronological order. As a result, the Court will first address many of Munt's various motions—starting with the Motion to Amend—before addressing the Motion to Dismiss itself. *See Pure Country Inc. v. Sigma Chi Fraternity*, 312 F.3d 952, 955 (8th Cir. 2002); *see, also*, *Hazley v. Roy*, No. 16-cv-3935 (SRN/TNL), 2018 WL 1399309, *5 (D. Minn. March 20, 2018) ("Eighth Circuit precedent instructs that courts should not decide a party's motion to dismiss without also considering the opposing party's pending motion to amend the pleadings."). After reviewing the Motion

to Dismiss (which the Court recommends granting only in part), the Court will consider Munt's TRO-related motions.

### A.    Motion to Amend

The Court will first consider the Motion to Amend. Its first request is that this Court permit Munt to file a second amended complaint—specifically, the document filed at Docket Entry 36-1. Under Federal Rule of Civil Procedure 15(a)(1)(B), "[a] party may amend its pleading once as a matter of course within . . . 21 days after service of a motion under Rule 12(b), (e), or (f) . . . ." Under Rule 15(a)(1)(B), Munt's request to install the Amended Complaint as this action's operative pleading occurred "as a matter of course," as he filed that pleading well before Defendants filed the Motion to Dismiss.

But "[i]n all other cases" where a plaintiff seeks to amend his pleading, he or she "may amend [the] pleading only with the opposing party's written consent or the court's leave." Fed. R. Civ. P. 15(a)(2). Defendants oppose the Motion to Amend, so Munt needs this Court's leave to have the proposed second amended complaint govern this action. Rule 15(a)(2) states that in considering a request to permit an amended complaint, "[t]he court should freely give leave when justice so requires."

Here, Munt has already repeatedly stated that he plans to file **another** amended complaint, over and above the proposed second amended complaint that is the subject of the Motion to Amend. (*See, e.g.*, Dkt. 77 at 1 (noting that Munt anticipates filing a "next amended complaint for this suit"); *id.* at 4 (seeking leave to file "another" amended complaint).) This makes granting the present Motion to Amend largely pointless—Munt will simply be filing another motion to amend with another proposed amended complaint.

As a result, justice plainly does not require that the Court grant the Motion to Amend, and the Court denies the Motion.[11]  In denying the Motion to Amend on this ground, the Court does not prejudge the appropriateness of any subsequent proposed amendment by Munt.

### B.     Sanctions Request in First Court Requests

The Court also recommends denial of the sanctions request in the First Court Requests.  Munt seeks sanctions because Defendants used his pleadings for allegedly improper purposes.  (Dkt. 56 at 6.)  It is unclear under what legal authority Munt seeks sanctions because Munt did not identify what legal standard should govern his request for sanctions, and he instead suggests that it is up to this Court to determine "the proper steps to take."[12]  (*Id.* at 7.)  The Court disagrees.  It is Munt's responsibility to specify the sort of sanctions that he wants, identify the governing legal standard (whether under Federal Rule of Civil Procedure 11 or some other rule, statute, or principle), and then apply that standard to this action's particulars.  Because the November 2019 sanctions request fails to do that, and thus fails to show Munt is entitled to sanctions under any applicable

---

[11]     If Munt files another motion to amend, he must comply with Local Rule 15.1.  Munt's current Motion to Amend does not contain the "version of the proposed amended pleading that shows—through redlining, underlining, strikeouts, or other similarly effective typographic methods—how the proposed amended pleading differs from the operative pleading" required by Local Rule 15.1.  Munt contends that he does not know how to generate a document showing the changes between two versions of a filing or is not able to do so.  (*See* Dkt. 36 at 3.)  Munt may show the changes using "similarly effective typographic methods" that show the Court and parties how the proposed amended complaint and the operative Amended Complaint differ.

[12]     Because the basis for Munt's three sanctions requests is unclear, the Court makes a report and recommendation with respect to those requests rather than an order.

standard, the Court recommends denial of the sanctions request in the First Court Requests.

### C.    Second Court Requests

As discussed above (*see* Section I.F *supra*), Munt's Second Court Requests ask the Court to (1) stay this litigation until Munt returns to MCF-OPH, and (2) levy various sanctions on Defendants.  The Court will address the sanctions request first, then analyze the request for a stay.

The sanctions request in the Second Court Requests suffers from the same flaws as its November 2019 cousin: Munt again fails to identify any governing legal standards for applying sanctions, and again fails to apply this case's facts to that standard.  (*See* Dkt. 67 at 3-7.)  Moreover, it appears that Munt may be seeking sanctions under Federal Rule of Civil Procedure 11.  (*See id.* at 3 ("Defendants have repeatedly lied to and mislead [sic] this Court.").)  Federal Rule of Civil Procedure 11(c) establishes certain requirements for sanctions motions brought under that Rule:

> A motion for sanctions must be made separately from any other motion and must describe the specific conduct that allegedly violates Rule 11(b).  The motion must be served under Rule 5, but it must not be filed or be presented to the court if the challenged paper, claim, defense, contention, or denial is withdrawn or appropriately corrected within 21 days after service or within another time the court sets.

The December 2019 sanctions request violates both of these requirements.  Munt included this sanctions request in a filing with numerous other requests, not in a "motion . . . made separately from any other motion."  (*See generally* Dkt. 67.)  Furthermore, there is no indication that Munt served the Second Court Requests on

Defendants in advance, to give them an opportunity to withdraw or correct the "challenged paper, claim, defense, contention, or denial." The sanctions request within the Second Court Requests is thus deficient both procedurally and substantively, and the Court therefore recommends its denial.

This leaves the stay request. Caselaw is clear that "the power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants," and that "[h]ow this can best be done calls for the exercise of judgment, which must weigh competing interests and maintain an even balance." *Landis v. N. Am. Co.*, 299 U.S. 248, 254–55 (1936); *see also Cottrell v. Duke*, 737 F.3d 1238, 1248 (8th Cir. 2013) (quoting *Landis*). Deciding whether to grant a stay is within the discretion of the district court, *see, e.g.*, *Maxim Def. Indus., LLC v. Kunsky*, No. 19-CV-1225 (PAM/LIB), 2019 WL 5893141, at *4 (D. Minn. Sept. 25, 2019) (quoting *Arctic Cat Inc. v. Polaris Indus. Inc.*, No. 13-cv-3579 (JRT/FLN), 2015 WL 6757533, at *2 (D. Minn. Nov. 5, 2015)), but courts should issue stays only where they "would be a proper exercise" of that discretion, *Rhines v. Weber*, 544 U.S. 269, 276 (2005) (citing *Clinton v. Jones*, 520 U.S. 681, 706 (1997)).

When analyzing a motion for a stay, the burden of persuasion rests with the movant. *See, e.g.*, *Kreditverein der Bank Austria Creditanstalt fur Niederosterreich und Bergenland v. Nejezchleba*, 477 F.3d 942, 945 n.3 (8th Cir. 2007) (citing *Clinton*, 520 U.S. at 708). Courts consider factors including "maintaining control of the court's docket, conserving judicial resources, and providing for the just determination of pending

cases." *Munt v. Roy*, No. 18-CV-2144 (SRN/SER), 2019 WL 4389005, at *13 (D. Minn. Sept. 13, 2019) (citing *Kemp v. Tyson Seafood Grp., Inc.*, 19 F. Supp. 2d 961, 964–65 (D. Minn. 1998)); *see also Diaz-Lebel v. TD Bank USA, N.A.*, No. 17-CV-5110 (MJD/BRT), 2018 WL 8754122, at *1 (D. Minn. Feb. 23, 2018) (providing broadly similar list of factors (citing *Frable v. Synchrony Bank*, 215 F. Supp. 3d 818, 821 (D. Minn. 2016)). They should also weigh the parties "'competing interests.'" *Id.* (quoting *Lunde v. Helms*, 898 F.2d 1343, 1354–55 (8th Cir. 1990)). Courts may also consider the "anticipated length of the stay." *Diaz-Lebel*, 2018 WL 8754122, at *1 (D. Minn. Feb. 23, 2018).

Considering these factors, the Court concludes that a stay is not warranted. Munt complains that he has been taken from witnesses at MCF-OPH, thus making it "impossible to get the affidavits needed to support [his] TRO request." (Dkt. 67 at 2.) The transfer may well make getting affidavits harder, but the Court cannot conclude that it makes it impossible.[13] Indeed, Munt has had plenty of time to collect affidavits in support of his requests for preliminary injunctive relief, and gives no indication that he has even tried to do so. The Court also observes that the "anticipated length of the stay" here is indeterminate: because the Court is not going to order Defendants to transfer Munt back to MCF-OPH, entering a stay of this litigation pending his return would effectively

---

[13]     Munt also claims that Defendants took from him a "detailed log of staff behavior that was critical evidence" for this action; this allegedly had "dates and times, and descriptions that could be corroborated by video to prove [Munt's] assertions." (Dkt. 67 at 3 & n.2.) However, Munt has not demonstrated that lack of access to this log requires this litigation to be delayed.

create a potentially permanent stay.  The Court therefore denies Munt's request for a stay of this litigation until he returns to MCF-OPH.

In summary, the Court recommends denial of the request for sanctions and denies the request for a stay in the Second Court Requests.

### D.    Motion to Strike

The Court next turns to Munt's Motion to Strike—that is, his request that this Court strike Defendants' reply in support of the Motion to Dismiss.  Motions to strike are governed by Federal Rule of Civil Procedure 12(f).  Under Rule 12(f), "[t]he court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."  The U.S. Court of Appeals for the Eighth Circuit has noted that motions to strike are "viewed with disfavor and infrequently granted."  *Lunsford v. United States*, 570 F.2d 221, 229 (8th Cir. 1977) (citing 5 Charles Alan Wright & Arthur Miller, Federal Practice and Procedure § 1380, at 783 (1969)).

The Motion to Strike will not be an exception to the general rule.  First, as a procedural matter, the Motion to Strike seeks to strike material from a reply in support of a motion to dismiss.  Rule 12(f) concerns striking matters "from a pleading," and under Rule 7, a reply in support of a motion to dismiss is not a pleading.  *See* Fed. R. Civ. P. 7(a) (listing "pleadings").  "This point has been made repeatedly, both by judges of this District and judges of other districts," *Carlson Mktg. Grp., Inc. v. Royal Indem. Co.*, No. 04-CV-3368 (PJS), 2006 WL 2917173, at *2 (D. Minn. Oct. 11, 2006) (citing cases)— and indeed, has been explained at least once to Munt himself, *see Munt v. Roy*, No. 17-CV-5215 (SRN/SER), 2018 WL 7247179, at *15 (D. Minn. June 25, 2018) (quoting

23

*Carlson Mktg. Grp.*), *R. &.R. adopted in relevant part*, 2019 WL 157289 (D. Minn. Jan. 10, 2019), *aff'd sub nom. Munt v. Schnell*, 777 F. App'x 181 (8th Cir. 2019). In and of itself, this procedural point is enough to justify denying the Motion to Strike.

Second, even if the Court ignored this procedural problem, the Motion to Strike fails in substantive terms as well. The vast bulk of the Motion to Strike engages in substantive argument about points made in Defendants' reply. Scattered throughout this argument are claims of lies, misrepresentations, misstatements of law, and criminal conduct by Defendants, but the thrust here is simply that Munt disagrees with Defendants' reply arguments. These substantive points do not amount to anything "redundant, immaterial, impertinent, or scandalous" such that they should be stricken (even if Rule 12(f) applied to reply briefs—which it does not).

One point in the Motion to Strike merits further discussion. Munt complains that Defendants' reply observes that Munt's transfer from MCF-OPH to another facility may moot his claims. (*See, e.g.*, Dkt. 75 at 3, 5; *see also* Dkt. 74 at 6 n.1, 11 n.6 (presenting relevant footnotes).) Munt claims that he has "not been provided any opportunity to oppose this" and that as a result, "[a]nything to do with mootness must be stricken." (Dkt. 75 at 3.)

Munt's demand for an opportunity to respond to the mootness argument is puzzling. Munt substantively responded to other arguments made in Defendants' reply in his Motion to Strike (*e.g.*, *id.* at 3-4), yet did not make any substantive response to the argument that some or all of his claims are now moot. Instead, he chose to only argue that the reply must be stricken as to Defendants' mootness footnotes and to seek a later

opportunity to reply.  (Dkt. 75 at 5.)  Munt had demonstrated that he is capable of filing

materials to express his positions, so the Court rejects the idea that Munt has had no

opportunity to respond to mootness concerns.  More importantly, however, whether

Munt's transfer moots some or all of his claims is a question that goes to this Court's

jurisdiction over those claims.[14]  Courts have to address such jurisdictional questions sua

sponte, even if the parties fail to present them at all—in other words, the Court cannot

simply bypass the mootness issue.  This means that the mootness point can be properly

raised at any time, and Defendants did nothing wrong by pointing to the issue in certain

footnotes in their reply brief.

In conclusion, the Court denies the Motion to Strike.

### E.    Sanctions Motion

The Court next turns to Munt's Sanctions Motion, which again argues that

Defendants misled the Court.  (*E.g.*, Dkt. 77 at 5 (arguing Defendants have "contempt for

this Court"); Dkt. 81 at 1 (arguing Defendants misled the Court).)  Unlike Munt's other

sanctions requests, the Sanctions Motion complies with Rule 11(c)'s requirement that a

sanctions motion be a standalone filing.  But as with the other sanctions requests, the

Sanctions Motion does not meet the demand that a sanctions motion "must not be filed or

be presented to the court if the challenged paper, claim, defense, contention, or denial is

withdrawn or appropriately corrected within 21 days after service or within another time

---

[14]    In their opposition to Munt's Sanctions Motion, Defendants state they made no request for a finding of mootness.  (Dkt. 80 at 3.)

the court sets." Defendants indicate that Munt never served them with a copy of the Sanctions Motion before filing it.  (*See* Dkt. 80 at 3.)

In response, Munt says that he "did notify Defendants of the basis for [his] motion and gave them 21 days to make things right."  (Dkt. 81 at 4.)  Munt does not explain where he provided this notice, but in any event, under Rule 11(c), what matters is that Munt appears to concede that he did not actually follow the rule.  *See, e.g.*, *VanDanacker v. Main Motor Sales Co.*, 109 F. Supp. 2d 1045, 1053–54 (D. Minn. 2000) ("In order to seek the imposition of sanctions on an opponent under Rule 11, the movant must follow the procedure specified in the Rule.").  As a result, the Court recommends denial of the Sanctions Motion.[15]

### F.    Motion to Dismiss

#### 1.    Screening Standards

Defendants bring the Motion to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)—and specifically, under 12(b)(1) and 12(b)(6).  (*See, e.g.*, Dkt. 43 at 1.) Rule 12(b)(1) concerns claims that a court lacks subject matter jurisdiction over part or all of an action.  *See, e.g.*, *Johnson v. United States*, 534 F.3d 958, 964 (8th Cir. 2008). "Federal courts are courts of limited jurisdiction, possessing only that power authorized by Constitution and statute."  *Gunn v. Minton*, 568 U.S. 251, 256 (2013) (quotation marks and citations omitted).  As a result, subject matter jurisdiction "is a threshold

---

[15]    The Court also notes that the Sanctions Motion, like Munt's other requests for sanctions, also fails to point to any applicable legal standard, much less apply the relevant standard to the facts.  This too is a sufficient reason for this Court to recommend denial of the sanctions request.

requirement" that courts must assure themselves of "in every federal case." *Turner v. Armontrout*, 922 F.2d 492, 493 (8th Cir. 1991) (citing *Kronholm v. F.D.I.C.*, 915 F.2d 1171, 1174 (8th Cir. 1990)).

When considering a Rule 12(b)(1) motion, "'the plaintiff will have the burden of proof that jurisdiction does in fact exist.'" *Osborn v. United States*, 918 F.2d 724, 730 (8th Cir. 1990) (quoting *Mortenson v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3rd Cir. 1977)).

A court considering a Rule 12(b)(1) motion must first determine whether the motion presents a "facial attack" or a "factual attack." *Id.* at 729 n.6 (quoting *Menchaca v. Chrysler Credit Corp.*, 613 F.2d 507, 511 (5th Cir. 1980)). "In a facial challenge to jurisdiction, all of the factual allegations concerning jurisdiction are presumed to be true and the motion is successful if the plaintiff fails to allege an element necessary for subject matter jurisdiction." *Titus v. Sullivan*, 4 F.3d 590, 593 (8th Cir. 1993) (citing *Eaton v. Dorchester Dev., Inc.*, 692 F.2d 727, 731–32 (11th Cir. 1982)). For a factual attack, in contrast, a court "'considers matters outside the pleadings, and the non-moving party does not have the benefit of 12(b)(6) safeguards.'" *Davis v. Anthony, Inc.*, 886 F.3d 674, 679 (8th Cir. 2018) (quoting *Osborn*, 918 F.2d at 729 n.6)). "If the asserted basis of federal jurisdiction is patently meritless, then dismissal for lack of jurisdiction is appropriate." *Biscanin v. Merrill Lynch & Co., Inc.*, 407 F.3d 905, 907 (8th Cir. 2005) (citing cases).

Motions to dismiss under Rule 12(b)(6) do not concern jurisdiction; instead, they assert that a plaintiff's pleadings "fail[] to state a claim upon which relief can be

granted."  When considering a Rule 12(b)(6) motion, a court construes pleadings in the light most favorable to the nonmoving party, and the court must take a pleading's factual allegations to be true.  *See, e.g., Ashley County v. Pfizer, Inc.*, 552 F.3d 659, 665 (8th Cir. 2009) (quoting *Wishnatsky v. Rovner*, 433 F.3d 608, 610 (8th Cir. 2006)).  Furthermore, a court must afford the nonmoving party all reasonable inferences from a pleading's allegations.  *See, e.g., Blankenship v. USA Truck, Inc.*, 601 F.3d 852, 853 (8th Cir. 2010) (citing *Crooks v. Lynch*, 557 F.3d 846, 848 (8th Cir. 2009)).

Notwithstanding these points, to withstand a Rule 12(b)(6) motion, litigants must properly plead their claims under Federal Rule of Civil Procedure 8 and meet the principles articulated by the U.S. Supreme Court in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009).  Under Rule 8(a)(2), a pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief."  This standard "does not require detailed factual allegations, but [does demand] more than an unadorned, the-defendant-unlawfully-harmed-me-accusation."  *Iqbal*, 556 U.S. at 678 (internal quotation marks and citation omitted).  "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'"  *Id.* (quoting *Twombly*, 550 U.S. at 555).

As a result, to "survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Id.* (quoting *Twombly*, 550 U.S. at 570).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (citing *Twombly*, 550 U.S. at

28

556).  "[T]he plausibility standard, which requires a federal court complaint 'to state a

claim for relief that is plausible on its face, . . . asks for more than a sheer possibility that

a defendant has acted unlawfully.'"  *Ritchie v. St. Louis Jewish Light*, 630 F.3d 713, 717

(8th Cir. 2011) (quoting *Iqbal*, 556 U.S. at 678 (ellipses in *Ritchie*)).  "Determining

whether a complaint states a plausible claim for relief [is] a context-specific task that

requires the reviewing court to draw on its judicial experience and common sense."

*Iqbal*, 556 U.S. at 679 (citation omitted).

Following *Twombly* (and proving consistent with *Iqbal*), the Eighth Circuit has

provided further guidance on Rule 8's pleading standard:

> While a plaintiff need not set forth "detailed factual allegations," *Twombly*,
> [550 U.S. at 555], or "specific facts" that describe the evidence to be
> presented, *Erickson v. Pardus*, [551 U.S. 89, 93 (2007)] (per curiam), the
> complaint must include sufficient factual allegations to provide the grounds
> on which the claim rests. *Twombly*, [550 U.S. at 555 n.3].  A district court,
> therefore, is not required "to divine the litigant's intent and create claims that
> are not clearly raised," [*Bediako v. Stein Mart, Inc.*, 354 F.3d 835, 840 (8th
> Cir. 2004)], and it need not "conjure up unpled allegations" to save a
> complaint.  *Rios v. City of Del Rio*, 444 F.3d 417, 421 (5th Cir. 2006)
> (internal quotation omitted).

*Gregory v. Dillard's, Inc.*, 565 F.3d 464, 473 (8th Cir. 2009).

For Rule 12(b)(6) purposes, the Eighth Circuit has interpreted a complaint's "face"

to include public records and materials that the complaint embraces, as well as materials

attached to the complaint.  *See, e.g.*, *C.H. Robinson Worldwide, Inc. v. Lobrano*, 695 F.3d

758, 764 (8th Cir. 2012) (quoting cases); *Stahl v. U.S. Dep't of Agric.*, 327 F.3d 697, 700

(8th Cir. 2003) (citing *Faibisch v. Univ. of Minn.*, 304 F.3d 797, 802–03 (8th Cir. 2002)).

In this action, as in others, "'the Court examines the allegations in [Munt's operative

complaint] and takes note of Munt's litigation in this District, as his lawsuits are matters of public record, without the need to convert Defendants' motion into a motion for summary judgment.'" *Munt v. Schnell*, No. 18-CV-3390 (DWF/ECW), 2020 WL 1695420, at *7 (D. Minn. Jan. 31, 2020) (quoting *Munt v. Roy*, No. 17-CV-5215 (SRN/SER), 2019 WL 157289, at *2 (D. Minn. Jan. 10, 2019)), *R. & R. adopted*, 2020 WL 968353 (D. Minn. Feb. 28, 2020).

### 2.    Mootness Due to Transfer

As a threshold question, the Court must address whether Munt's November 2019 transfer from MCF-OPH to MCF-Rush City moots this action (or any part of it). Defendants' reply in support of the Motion to Dismiss states (while discussing Munt's conspiracy claims and claims for equitable relief) that "Munt is no longer housed at MCF-OPH, which not only removes him from the alleged harm he alleges but also moots his claims" and "Munt is no longer housed at MCF-OPH and so, his claims for equitable relief are moot." (Dkt. 74 at 6 n.1, 11 n.6.) As discussed in the Background section above, there is no dispute that Munt was transferred, so the question for the Court is simply how the transfer affects this litigation.

"Generally, a claim is moot when changed circumstances already provide the requested relief and eliminate the need for court action." *Hillesheim v. Holiday Stationstores, Inc.*, 953 F.3d 1059, 1061 (8th Cir. 2020) (internal quotation and citation omitted). Where claims are moot, a court lacks subject matter jurisdiction under Article III of the U.S. Constitution. *See id.* (citing cases). Because a court must maintain its own jurisdiction, this Court may—indeed, should—consider mootness questions sua sponte,

whether or not the parties themselves raise the questions.  *See, e.g., Fort Bend Cty. v. Davis*, 139 S. Ct. 1843, 1849 (2019) (citing *Gonzalez v. Thaler*, 565 U.S. 134, 141 (2012)).

Notwithstanding Defendants' statements, Munt's transfer plainly does not make all of his claims moot.  The Amended Complaint asserts damages claims.  (Dkt. 11 at 27-28.)  As the Supreme Court has recently emphasized, "claim[s] for money damages . . . if at all plausible, ensure a live controversy" for Article III purposes because "[f]or better or worse, nothing so shows a continuing stake in a dispute's outcome as a demand for dollars and cents."  *Mission Prod. Holdings, Inc. v. Tempnology, LLC*, 139 S. Ct. 1652, 1660 (2019); *see also Comfort Lake Ass'n, Inc. v. Dresel Contracting, Inc.*, 138 F.3d 351, 355–56 (8th Cir. 1998) ("When a claim for injunctive relief becomes moot, a related claim for money relief is not mooted 'as long as the parties have a concrete interest, however small, in the outcome of the litigation.'") (quoting *Ellis v. Brotherhood of Ry., Airline & S.S. Clerks*, 466 U.S. 435, 442 (1984)).  Munt's transfer thus does not moot this action.

This leaves the question of whether the transfer renders moot any parts of the Amended Complaint.  The Court notes here the Amended Complaint's various requests for relief.  (*See* Section I.A.5 *supra*.)  In the Court's view, Munt's transfer does not moot his requests for declaratory relief, compensatory relief, and miscellaneous relief.  (*See* Dkt. 11 at 25-29.)  What remains are the injunctive relief requests.  Reviewing those requests, the only one that the Court concludes is now moot is Munt's specific demand that he not be transferred from MCF-OPH.  (*See id.* at 26.)  Given that Munt has been

31

transferred, and that there is no indication that a return to MCF-OPH is imminent, the Court believes that his demand not to be transferred from MCF-OPH is now moot. The Court thus recommends dismissing the Amended Complaint without prejudice to the extent it seeks a ban on Munt's transfer from MCF-OPH.[16]

### 3.    First Amendment Retaliation Claims

As discussed above (*see* Section I.A.4 *supra*), the Court construes the Amended Complaint as bringing First Amendment retaliation claims against all Defendants. To allege a First Amendment retaliation claim, a plaintiff must allege that "'(1) he engaged in a protected activity, (2) [officers] took adverse action against him that would chill a person of ordinary firmness from continuing in the activity, and (3) the adverse action was motivated at least in part by the exercise of the protected activity.'" *Waters v. Madson*, 921 F.3d 725, 741 (8th Cir. 2019) (quoting *Revels v. Vincenz*, 382 F.3d 870, 876 (8th Cir. 2004)). Defendants do not challenge that Munt has properly pleaded the first element of a retaliation claim. (*See* Dkt. 43 at 5-8.) The Court understands the protected activity alleged by Munt include engaging in the grievance process and requesting video for purposes of another lawsuit brought by Munt against the commissioner of corrections and other MNDOC officials. (*See* Dkt. 11 at 10-11 ("Following the above request [for the video], Witter met with me and threatened retaliation because of it."); *id.* at 14

---

[16]    To be clear, in recommending that this part of Munt's injunctive relief requests be found moot, the Court draws no conclusions about the merits of Munt's other requests, or about whether this Court has the power to grant them. This discussion merely draws the limited conclusion that Munt's request not to be transferred has been mooted by his actual transfer that occurred after he filed the Amended Complaint.

("When others confronted him over the rumors the inmate tried to justify his actions by admitting that he was doing so on order from [B]esetelle and Mosser, who had been ordered to try to get Plaintiff messed up by Besonen because of the kites Plaintiff was writing about him.").)

### a.    Presence of adverse action

Defendants generally do not argue that Munt fails to properly plead adverse actions by Defendants, but they make an exception for Munt's retaliation claim against Witter. (*See* 43 at 7-8.) Specifically, Defendants argue that Munt only ascribes verbal threats to Witter, and that verbal threats alone are not a constitutional violation. (*See id.*)

To analyze whether an "adverse action" would "chill a person of ordinary firmness from continuing in the activity," courts apply an "objective test" where "the question is not whether the plaintiff himself was deterred, though how plaintiff acted might be evidence of what a reasonable person would have done." *Eggenberger v. W. Albany Twp.*, 820 F.3d 938, 943 (8th Cir. 2016) (quoting *Scheffler v. Molin*, 743 F.3d 619, 621 (8th Cir. 2014) (cleaned up; internal quotation marks omitted)). The conduct need not itself violate the Constitution; the violation consists of taking the action "in retaliation for 'the exercise of a constitutionally protected right.'" *Spencer v. Jackson Cty.*, 738 F.3d 907, 911-12 (8th Cir. 2013) (quoting *Cody v. Weber*, 256 F.3d 764, 771 (8th Cir. 2001)).[17] Whether a given act is sufficiently "chilling" is generally a jury question. *See,*

---

[17]    Defendants cite *Martin v. Sargent*, 780 F.2d 1334, 1339 (8th Cir. 1985), for the proposition that "'[v]erbal threats do not constitute a constitutional violation,'" suggesting that Witter's alleged threat therefore cannot be an "adverse action." (Dkt. 43 at 7.) But *Martin* is inapposite. As *Spencer* indicates—and as Munt points out as well

*e.g.*, *Santiago v. Blair*, 707 F.3d 984, 992 (8th Cir. 2013) (quoting *Garcia v. City of Trenton*, 348 F.3d 726, 729 (8th Cir. 2003)).

Munt alleges that after he requested certain video evidence for litigation, Witter "met with [Munt] and threatened retaliation because" of the request.  (Dkt. 11 at 13; *see also id.* at 17 ("Lt. Witter threatened [Munt] over the request, in an attempt to chill his exercise of his rights.").)  To be sure, the Complaint gives little detail about this threat (e.g., Witter's specific words).  And it is far from clear whether the alleged threat actually deterred Munt from doing anything.  But Eighth Circuit precedent is clear that the relevant test here is objective, not subjective, and thus whether Munt was actually deterred is not relevant to the question of whether the alleged "threatened retaliation" constitutes an adverse action.

Furthermore, the Court takes particular note of *Santiago v. Blair*, in which the Eighth Circuit affirmed in relevant part a district court's summary judgment ruling denying qualified immunity to certain prison staff.  707 F.3d at 994.  Of particular note, *Santiago* held that a jury could find that a defendant's statement to the plaintiff that "things are going to get worse" was an adverse action, given that a "reasonable jury could conclude" that the statement could "chill a prisoner of ordinary firmness from engaging in the prison grievance process."  *Id.* (citing *Thaddeus-X v. Blatter*, 175 F.3d 378, 398

---

(*see* Dkt. 71 at 15-16)—that certain conduct would not violate someone's constitutional rights in a vacuum is consistent with that conduct being an adverse action if done to respond to exercises of First Amendment rights.  Furthermore, in *Martin*, the prisoner plaintiff brought only Eighth Amendment claims, not a First Amendment retaliation claim, and so the case never addresses whether threats can be adverse actions.  780 F.2d at 1336.

(6th Cir. 1999)).  If a retaliation claim can survives summary judgment due to evidence of such a statement, the Court concludes that a First Amendment retaliation claim featuring a plainly alleged—even if not fulsomely detailed—threat can survive a Rule 12(b)(6) motion.  The Court thus recommends denying the Motion to Dismiss to the extent it seeks to dismiss Munt's First Amendment retaliation claim against Witter based on a failure to plead an adverse action.

### b.    *Retaliatory motivation*

Defendants' main argument about Munt's retaliation claims is that Munt fails to properly plead that Defendants' adverse actions toward Munt were "motivated at least in part by [Munt's] exercise of . . . protected activity."  (*See* Dkt. 43 at 5-8.)  Defendants raise this argument with respect to Besonen, Desetelle, Mosser, and Parker (*see id.* at 6), so the Court focuses on them as well.

Describing the motivation element, the Supreme Court has stated that "[i]t is not enough to show that an official acted with a retaliatory motive and that the plaintiff was injured—the motive must cause the injury."  *Nieves v. Bartlett*, 139 S. Ct. 1715, 1722 (2019).  "Specifically, it must be a 'but-for' cause, meaning that the adverse action against the plaintiff would not have been taken absent the retaliatory motive."  *Id.* (citing *Hartman v. Moore*, 547 U.S. 250, 260 (2006)).  In addressing whether a but-for connection exists, "[t]emporal proximity" between the protected activity and the challenged conduct "is relevant even if not dispositive."  *Hoyland v. McMenomy*, 869 F.3d 644, 657 (8th Cir. 2017) (quoting *Peterson v. Kopp*, 754 F.3d 594, 603 (8th Cir. 2014) (cleaned up)).  The Court also observes that under Rule 9 of the Federal Rules of

Civil Procedure, "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally."

Given these rules, the Court has little difficulty concluding that Munt has sufficiently pleaded that Besonen, Desetelle, Mosser, and Parker took actions against Munt due to a retaliatory motive. Key allegations here include the following:

- After Munt made a request for certain video evidence for one of his suits, he met with Witter, who "threatened retaliation." (Dkt. 11 at 13.) "Shortly after" that meeting, "Desetelle, Mosser and Parker became extremely hostile towards [Munt] and began treating me disparately than other inmates." (*Id.*)

- After Munt communicated with Besonen to try and explain his request for video evidence—which Munt characterizes as "attempting to make peace"—"Mosser nearly returned to her prior demeanor and Desetelle and Parker tempered their hostility and disparate treatment." (*Id.* at 13-14.)

- When confronted, the "inmate agent" who purportedly was spreading rumors about Munt allegedly stated that he was "doing so on order from Desetelle and Mosser, who had been ordered to try to get [Munt] messed up by Besonen because of the kites Plaintiff was writing about him" and "physical assault was the intent of Besonen, Desetelle, and Mosser." (*Id*. at 14.)

- "Communications between Besonen, Desetelle, and Mosser resulted in a plan to spread rumors to inmates about [Munt] in an effort to get him assaulted for the kites he was writing about Besonen . . . ." (*Id.* at 17.)

The Court is mindful, of course, that discovery may well reveal that some or all of the conduct alleged here is false, or that whatever did happen is attributable to nonretaliatory motives. At this stage in the litigation, however, the above allegations sufficiently connect the Munt-related conduct of Besonen, Desetelle, Mosser, and Parker

to a desire to retaliate against Munt for pursuing litigation and filing prison grievances.[18]

The Court thus rejects Defendants' argument that Munt has failed to allege that Besonen, Desetelle, Mosser, and Parker acted based on a retaliatory motive.

### 4.    Conspiracy Claims

As discussed above, the Court construes Munt as bringing a conspiracy claim against all Defendants.  Specifically, the Court construes Munt as asserting that Defendants conspired to retaliate against Munt for his exercise of his First Amendment rights.  Munt appears to seek to bring these conspiracy claims under 42 U.S.C. § 1983 as well as under § 1985.  The Court will address the two forms of conspiracy—and Defendants' arguments against them—separately.

#### a.    Conspiracy under § 1983

To plead a § 1983 conspiracy claim, a plaintiff must allege that "(1) a defendant conspired with others to deprive [the plaintiff] of one or more constitutional rights; (2) at least one of the alleged co-conspirators engaged in an overt act in furtherance of the conspiracy; and (3) the overt act injured [the plaintiff]."  *Hines v. Minnesota Dep't of Corr.*, No. 18-CV-3250 (ECT/BRT), 2020 WL 1102210, at *13 (D. Minn. Jan. 31, 2020) (citing *White v. McKinley*, 519 F.3d 806, 814 (8th Cir. 2008)), *R. & R. adopted*, 2020 WL

---

[18]    The Court notes that of the cases cited by Defendants on page 6 of their brief relating to the specificity required to sufficiently allege retaliatory motive—*Sisneros v. Nix*, 95 F.3d 749, 752 (8th Cir. 1996); *Meuir v. Green County Jail Employees*, 487 F.3d 1115, 1119 (8th Cir. 2007); and *Halfacre v. Cruseturner*, 299 F. App'x 609, 609 (8th Cir. 2008) (unpublished opinion)—*Sisneros* and *Meuir* involved dismissals on summary judgment (not on a Rule 12(b)(6) motion) and *Halfacre* concerned dismissal after two "pretrial evidentiary hearings."  *See Sisneros*, 95 F.3d at 751; *Meuir*, 487 F.3d at 1117; *Halfacre*, 299 F. App'x at 609.

1082484 (D. Minn. Mar. 6, 2020); *see also Holmes v. Slay*, 895 F.3d 993, 1001 (8th Cir.

2018) (reciting similar elements) (quoting *Bonenberger v. St. Louis. Metro. Police Dep't*,

810 F.3d 1103, 1109 (8th Cir. 2016)). Furthermore, Munt also needs to allege the actual

deprivation of a constitutional right or privilege. *See Burton v. St. Louis Bd. of Police

Comm'rs*, 731 F.3d 784, 798 (8th Cir. 2013) (quoting *White*, 519 F.3d at 814).

Defendants raise four arguments why the Amended Complaint fails to properly allege a

§ 1983 conspiracy.

### i.    <u>Conspiracy allegations</u>

Defendants' first § 1983 conspiracy argument is that "nothing in the Complaint

shows that, if true, Defendants made any agreement with anyone else, much less

discussed with one another, the alleged rumors or formulate [*sic*] the intent to have Munt

be assaulted." (Dkt. 43 at 9.) The Court reads this as a challenge based on the first

element of a § 1983 conspiracy claim. Munt responds by pointing to various Amended

Complaint allegations that he says sufficiently plead an agreement's existence. (Dkt. 71

at 22-23.)

For several Defendants, the Court agrees with Munt, though this is arguably a

close call. The Amended Complaint alleges, for instance, that Besonen "has ordered his

staff to stir up trouble for [Munt]." (Dkt. 11 at 9.) It alleges that Witter shared "with

other staff members, eventually reaching Desetelle, Mosser, and Parker," the information

that Munt had certain evidentiary requests. (*Id.* at 11.) Munt also contends that shortly

after his meeting with Witter, Desetelle, Mosser, and Parker "became extremely hostile

towards [Munt] and began treating him disparately"; he also alleges that Desetelle,

Mosser, and Parker spoke with a "pet inmate[]" about Munt's request.  (*Id.* at 13; *see also id.* at 14, 17).  He further alleges that the "inmate agent" who purportedly was spreading rumors about Munt allegedly stated that he was "doing so on order from Desetelle and Mosser, who had been ordered to try to get [Munt] messed up by Besonen because of the kites Plaintiff was writing about him."  (*Id.* at 14.)  Given these allegations, the Court concludes that Munt has sufficiently alleged the first conspiracy element with respect to Besonen, Desetelle, Mosser, Parker, and Witter.

On the other hand, the Court also concludes that Munt has not properly alleged the first conspiracy element for the remaining Defendants—i.e., Schnell, Reishus, Wheeler, and Austreng.  (*See id.* at 6-9, 15-16.)  For these Defendants, the Amended Complaint has no allegations suggesting that these Defendants conspired to deprive Munt of his constitutional rights.  The Court therefore recommends dismissing the Amended Complaint's § 1983 conspiracy claim against Schnell, Reishus, Wheeler, and Austreng. Despite recognizing that dismissals pursuant to Rule 12(b)(6) are typically without prejudice, Defendants seek dismissal of all of Munt's claims with prejudice because, among other things, Munt admits that he has multiple lawsuits in which he raises claims of retaliation on the part of the DOC and having Defendants and MNDOC employees respond to the same sets of facts in multiple lawsuits would cause court congestion.  (*See* Dkt. 43 at 22.)  In view of the preference for dismissals without prejudice, and at this stage of the proceedings, the Court does not find Munt's other litigation to be a sufficient basis to depart from the general rule.  Accordingly, the Court recommends dismissal

without prejudice unless, as indicated with respect to Munt's § 1985(3) conspiracy claims, the Court concludes that Munt cannot plausibly allege such a claim.

### ii.    Deprivation of constitutional right or privilege

Defendants' second § 1983 conspiracy argument is that "Munt has neither asserted nor established an actual deprivation of a constitutional right or privilege." (Dkt. 43 at 9.) This appears to be a challenge concerning the fourth, supplemental element to a § 1983 conspiracy claim. In response, Munt argues that "the failure of a conspiracy to achieve its goals" is not dispositive, and contends that retaliation itself is a constitutional violation. (Dkt. 71 at 23.)

On the first point, the Court disagrees with Munt. It is plain from this element's wording that, to properly plead a conspiracy claim, a plaintiff must allege the actual deprivation of a right or privilege. In other words, if one pleads an inept conspiracy that tries, but fails to, infringe a plaintiff's rights, § 1983 conspiracy liability does not exist. *See, e.g.*, *Askew v. Millerd*, 191 F.3d 953, 957 (8th Cir. 1999) (citing *Villanueva v. McInnis,* 723 F.2d 414, 416 (5th Cir. 1984)); *see also Henry v. Johnson*, 950 F.3d 1005, 1015 (8th Cir. 2020) (quoting *Askew*). Munt's point here thus depends on whether he has alleged an actual deprivation of a constitutional right. And Munt's litigation history—which he refers to extensively in his own Amended Complaint—undercuts the idea that Defendants' conduct prevented him from filing lawsuits. The Amended Complaint also does not suggest that Munt has been unable to file grievances. (*See, e.g.*, Dkt. 11 at 12 ("He has grieved issues over notary services, supervision of staff failure to respond to kites and participation in other retaliatory conspiracies which are the subject of multiple

suits."); *id.* at 31 ("Plaintiff took all available administrative steps to grieve each of the issue raised herein.").)

This means that the success of Munt's responsive argument requires that experiencing retaliation is itself a constitutional violation. And here the Court agrees with Munt. Munt's First Amendment right is not simply a right to file grievances and pursue claims in the courts. It is a right to engage in these things **without being retaliated against for doing so**. As the Supreme Court has explained, "'as a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions' for engaging in protected speech." *Nieves*, 139 S. Ct. at 1722 (2019) (quoting *Hartman*, 547 U.S. at 256). In the Court's view, Munt has alleged that he has been deprived of that right. (*See generally* Section II.F.3 *supra* (discussing whether Munt has alleged First Amendment retaliation claim.) The Court thus rejects Defendants' argument concerning the fourth § 1983 conspiracy element.

### iii.    Injury from overt acts

Defendants' next argument is that "Munt does not show how the alleged overt acts actually harmed him." (Dkt. 43 at 10.) The Court reads this as a challenge based on the third § 1983 conspiracy element. Munt responds that being deprived of a constitutional right is itself an applicable injury. (Dkt. 71 at 23.)

Neither Defendants nor Munt cited any law addressing how to analyze this § 1983 conspiracy element when the alleged conspiracy is one to engage in First Amendment retaliation. The Court concludes that, at least in this context, a plaintiff can indeed plead the conspiracy's injury element by alleging that he or she has been retaliated against—

that is, the retaliation is itself the injury. The Court is persuaded here by the numerous cases indicating that one's First Amendment rights are infringed not just by retaliation that succeeds in stopping protected activity, but even by retaliation that fails to stop the activity. *See, e.g.*, *Harrison v. Springdale Water & Sewer Comm'n*, 780 F.2d 1422, 1427-28 (8th Cir. 1986) (noting that "[i]t is not necessary that the [individual] succumb entirely or even partially to the threat as long as the threat or retaliatory act was intended to limit the [individual's] right of access") (quoting *Sanders*, 724 F.2d at 666); *Ellingson v. Piercy*, No. 2:14-CV-04316 (NKL), 2016 WL 4033259, at *2-3 (W.D. Mo. July 27, 2016) (quoting *Harrison*); *Zutz v. Nelson*, No. 08-CV-0958 (JNE/RLE), 2008 WL 11463465, at *11 (D. Minn. Dec. 1, 2008), *aff'd*, 601 F.3d 842 (8th Cir. 2010).

The very point of these cases is that retaliation infringes on one's First Amendment rights even if the plaintiff bears the retaliation's costs and nevertheless engages in the relevant activity. This implies that suffering the retaliation is in fact the key injury to consider. The Court therefore concludes that Munt has adequately alleged that he was injured by acts of those Defendants still facing § 1983 conspiracy claims. The Court will not recommend dismissal of any part of Munt's § 1983 conspiracy claim based on this argument.

### iv.    Allegations concerning overt acts

Finally, Defendants argue that "Munt's claims regarding the Defendants' conspiracy and alleged overt acts in furtherance of the conspiracy do not rise above the speculative level"—that is, that the Amended Complaint "does not state or support a conspiracy claim that is plausible on its face." (Dkt. 43 at 10.) This is essentially a

*Twombly*/*Iqbal* challenge based on the first two § 1983 conspiracy elements. As to the argument that Munt has failed to properly plead allegations suggesting a conspiracy, the Court rejects that argument with respect to Besonen, Desetelle, Mosser, Parker, and Witter for the reasons given above. (*See* Section II.F.4.a.1 *supra*.)

As for the argument that the Amended Complaint fails to allege any overt acts in furtherance of the conspiracy, the Court again disagrees—at least for Besonen, Desetelle, Mosser, Parker, and Witter. In brief, Munt alleges (among other things) that Witter directly threatened him (*see* Dkt. 11 at 11); that Desetelle, Mosser, and Parker all behaved toward him (Munt) in a hostile fashion (*id.* at 13); that Desetelle, Mosser, and Parker had a fellow inmate spread rumors about Munt in an attempt to get Munt assaulted (*id.* at 17); and that Besonen allegedly ordered Desetelle and Mosser to "try to get [Munt] messed up" (*id.* at 14). For purposes of analyzing a motion to dismiss, the Court cannot conclude that Munt has failed to allege overt acts by these Defendants.

### b.    *Conspiracy under § 1985(3)*

Munt also suggests that he is bringing conspiracy claims under 42 U.S.C. § 1985. (*See id.* at 1, 4-5.) Section 1985 specifically bars certain sorts of conspiracies interfering with civil rights. *See generally* 42 U.S.C. § 1985(1)-(3). Subsection 1 concerns conspiracies to prevent "officers" from performing certain duties, and subsection 2 concerns conspiracies to intimidate or interfere with witnesses. Defendants contend— and Munt does not dispute—that Munt cannot proceed under subsections 1 or 2. (*See* Dkt. 43 at 10-11; Dkt. 71 at 24-25.)

43

The Court therefore turns to § 1985(3).  Under subsection 3 (in relevant part):

> If two or more persons in any State or Territory conspire . . . for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws; . . . in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

Defendants raise six arguments why Munt cannot press a conspiracy claim under § 1985(3).  (Dkt. 43 at 10-11.)  The Court need only address the first, however, as it proves dispositive.  The key argument is that the Court should dismiss Munt's § 1985(3) conspiracy claims "because he fails to allege an essential element of [§ 1985(3)], that there 'be some racial, or perhaps otherwise class-based, invidious discriminatory animus behind the conspirators' action.'"  (*Id.* at 11 (quoting *Coleman v. Garber*, 800 F.2d 188, 190 (8th Cir. 1986)).  Munt does not dispute that this element exists; instead, he responds that he has alleged it here because "inmates are a particularly vulnerable group" and that "staff have animus towards them."  (Dkt. 71 at 24.)

Defendants are correct that § 1985(3) claims require an invidious animus.  *See Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 267-68 (1993) (quoting *Griffin v. Breckenridge*, 403 U.S. 88, 102 (1971)).  Munt does not suggest that any racial animus motivated Defendants, so his § 1985(3) conspiracy claim rests on alleging that Defendants were motivated by some "class-based[] invidiously discriminatory animus."

44

The Amended Complaint fails to do so, for at least two reasons. First, the gist of the Amended Complaint undermines the idea that animus against inmates motivated Defendants. After all, the gravamen of Munt's First Amendment retaliation claims is that Defendants mistreated him not because he is an inmate, but because he exercised his First Amendment rights. Indeed, the Amended Complaint presents numerous examples of Defendants being friendly to various prisoners. (*See, e.g.*, Dkt. 11 at 13, 15-17, 19.)

Second, even if one could read the Amended Complaint as suggesting an animus based on Munt's prisoner status, his ability to bring his § 1985(3) conspiracy claim would depend on whether being an inmate is the sort of "class" animus to which § 1985(3) applies. To the best of the Court's knowledge, the Supreme Court and Eighth Circuit have not weighed in on this point. One court in this District has specifically rejected this contention, citing numerous decisions from Courts of Appeals. *See Lunsford v. RBC Dain Rauscher CS*, No. 05-CV-2750 (DSD/RLE), 2006 WL 2844544, at *5 (D. Minn. Sept. 28, 2006) (citing cases). And the Court is unaware of any decisions suggesting that prisoners or inmates are a class meant to be protected by § 1985(3).

This Court agrees that prisoners are not a §1985(3)-protected group. The Court finds particularly persuasive here the Eleventh Circuit's reasoning in *Farese v. Scherer* (a case cited in *Lunsford*):

> Section 1985(3) provides a cause of action for a conspiracy to deprive "any person or class of persons of the equal protection of laws." This court has stated that § 1985(3) protects two types of classes: (1) "those kinds of classes offered special protection under the equal protection clause, and (2) classes that Congress was trying to protect when it enacted the Ku Klux Klan Act." Farese alleges that he states a claim against the Defendants under § 1985(3) because he is a member of the "prisoner class." Although we have never

addressed whether prisoners are a protected class under § 1985(3), we conclude that the district court properly dismissed Farese's § 1985(3) claim because prisoners are neither a class offered special protection under the equal protection clause nor a class that Congress intended to protect when it enacted § 1985(3).

342 F.3d 1223, 1229 n.7 (11th Cir. 2003) (citations omitted).

Under either argument above, Munt cannot bring conspiracy claims based on § 1985(3). The Court therefore recommends dismissing these conspiracy claims. Furthermore, because the Court sees no plausible way that Munt could replead his complaint to permit § 1985(3) conspiracy claims, the Court recommends that these claims be dismissed with prejudice.

### 5.    Equal Protection Claims

The Complaint's remaining causes of action are Munt's claims under the Fourteenth Amendment's Equal Protection Clause. Under the Clause, "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. Equal protection claims fall into two classes. The U.S. Supreme Court's "equal protection jurisprudence has typically been concerned with governmental classifications that 'affect some groups of citizens differently than others.'" *Engquist v. Ore. Dep't of Agr.*, 553 U.S. 591, 601 (2008) (quoting *McGowan v. Maryland*, 366 U.S. 420, 425 (1961)). In these cases, "[p]laintiffs . . . generally allege that they have been arbitrarily classified as members of an 'identifiable group,'" then claim that they have experienced unequal treatment because they are associated with that group. *Id.* (quoting *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979)).

In contrast, the Supreme Court has also recognized that plaintiffs can "in some circumstances" press an equal protection claim "even if the plaintiff has not alleged class-based discrimination, but instead claims that she has been irrationally singled out as a so-called 'class of one.'"  *Id.* (discussing *Village of Willowbrook v. Olech*, 528 U.S. 562 (2000) (per curiam)).  *Engquist* discussed class-of-one cases as follows:

> As we explained long ago, the Fourteenth Amendment "requires that all persons subjected to . . . legislation shall be treated alike, under like circumstances and conditions, both in the privileges conferred and in the liabilities imposed."   When those who appear similarly situated are nevertheless treated differently, the Equal Protection Clause requires at least a rational reason for the difference, to ensure that all persons subject to legislation or regulation are indeed being "treated alike, under like circumstances and conditions."  Thus, when it appears that an individual is being singled out by the government, the specter of arbitrary classification is fairly raised, and the Equal Protection Clause requires a "rational basis for the difference in treatment."

*Id.* (citations omitted).

The Amended Complaint does not specify whether Munt's equal-protection claim is a class-based claim or a class-of-one claim.  Because the briefing raises issues about both sorts of claims, the Court will address them in turn.

### a.    *Class-based equal protection claim*

For a prisoner to properly plead a class-based equal protection claim, he must allege "that he is treated differently from similarly-situated inmates and that the different treatment is based upon either a suspect classification or a 'fundamental right.'"  *Patel v. U.S. Bureau of Prisons*, 515 F.3d 807, 815 (8th Cir. 2008) (quoting *Weems v. Little Rock Police Dep't*, 453 F.3d 1010, 1016 (8th Cir. 2006)).  Here, the parties disagree as to

whether Munt has properly alleged different treatment based on a suspect class or fundamental right.  (*See* Dkt. 43 at 12; Dkt. 71 at 28-29.)

The Amended Complaint hints at two class-based ways that Munt allegedly was treated differently than others.  The first suggestion is that Munt was treated unequally based upon his status as a prisoner.  (*See* Dkt. 11 at 15.)  This is a nonstarter for at least two reasons.  First, as Defendants point out (*see* Dkt. 43 at 12), the Eighth Circuit has clearly specified that prisoners are not a suspect class for purposes of equal protection analysis, *see, e.g.*, *Murray v. Dosal*, 150 F.3d 814, 818 (8th Cir. 1998) (citing cases); *see also Richards v. Dayton*, No. 13-CV-3029 (JRT/JSM), 2015 WL 1522199, at *24 (D. Minn. Jan. 30, 2015) (quoting *Murray*), *R. & R. adopted sub nom.,* 2015 WL 1522237 (D. Minn. Mar. 30, 2015).[19]  Second, the gist of the First Amended Complaint is not that Defendants treated Munt differently because he was a prisoner; indeed, his point is that Defendants treated him worse **than other prisoners**.  (*See* Dkt. 11 at 15.)

This leaves open whether Munt has alleged differential treatment based upon a fundamental right.  Defendants suggest that the only fundamental right Munt invokes is the right to a fair opportunity to certain prison jobs.  (*See* Dkt. 43 at 12.)  And the Court agrees with Defendants that (as Munt has been told before) there is no constitutional right—much less a fundamental one—to a given prison job.  *See, e.g.*, *Lomholt v. Holder*, 287 F.3d 683, 684 (8th Cir. 2002) (citing *Mitchell v. Kirk*, 20 F.3d 936, 938 (8th Cir.

---

[19]   Munt suggests that the Eighth Circuit could revisit its conclusion that prisoners are not a suspect class.  (*See* Dkt. 71 at 29.)  Nevertheless, this Court must apply Eighth Circuit law as it currently exists.

1994); *Munt v. Schnell*, No. 18-CV-3390 (DWF/ECW), 2020 WL 1695420, at *16 (D.

Minn. Jan. 31, 2020) (citing *Lomholt*), *R. & R. adopted*, 2020 WL 968353 (D. Minn. Feb.

28, 2020)).

But Munt also argues that "[r]etaliation is violation of a fundamental

Constitutional right" (*see* Dkt. 71 at 28), and as the Court has already discussed, the

Amended Complaint properly alleges a First Amendment retaliation claim against several

defendants.  The retaliation Munt alleges is based on his attempts to make complaints

through the prison's grievance system, his attempts to request evidence through the same

system, and his attempts to communicate with MNDOC officials about his concerns.  If

there is a fundamental right to do these things, then Munt has in fact suggested that he has

been treated in a certain way because of his exercise of a fundamental right.

The Supreme Court has indicated that the rights protected by the First Amendment

are "fundamental rights" for equal-protection purposes.  *See, e.g.*, *Mass. Bd. of Ret. v.

Murgia*, 427 U.S. 307, 313 n.3 (1976) (citing *Williams v. Rhodes*, 393 U.S. 23 (1968)).

And the Eighth Circuit has stated that filing grievances is indeed a right protected by the

First Amendment.  *See Spencer*, 738 F.3d at 913 (citing *Lewis v. Jacks*, 486 F.3d 1025,

1029 (8th Cir. 2007)).  As a result, it appears that in principle, individuals can bring equal

protection claims if they allege that they have been treated differently than others based

on, e.g., their decision to file grievances.

But even if this theory is open to Munt, the Court concludes that he has failed to

properly plead this sort of class-based equal protection claim.  When considering class-

based equal protection claims, the Eighth Circuit and courts in this District have

repeatedly stated that to allege such a claim, a plaintiff must allege that he or she was

"'treated differently that other persons who were in all relevant respects similarly

situated.'"  *See, e.g.*, *Hager v. Arkansas Dep't of Health*, 735 F.3d 1009, 1015 (8th Cir.

2013) (citing cases); *Gilmore v. Cty. of Douglas, State of Neb.*, 406 F.3d 935, 938 (8th

Cir. 2005); *ARRM v. Piper*, 367 F. Supp. 3d 944, 958 (D. Minn. 2019) (quoting *Schmidt*

*v. Des Moines Pub. Sch.*, 655 F.3d 811, 820 (8th Cir. 2011)).  Furthermore, these cases

also suggest that to state a class-based equal protection claim, a complaint must point to

examples of similarly situated persons who were treated differently.  *See Hager*, 735 F.3d

at 1015; *Gilmore*, 406 F.3d at 937-38; *Piper*, 367 F. Supp. 3d at 958-59.

 Under this guideline, Munt has failed to properly state a class-based equal

protection claim.  To bring such a claim, Munt must allege that he was treated differently

than other similarly situated persons.  The Amended Complaint stresses that Defendants

treated Munt poorly because he engaged in protected First Amendment activity, but Munt

does not contend that he was treated differently from other inmates "similarly situated" to

him save for the fact that they did not engage in the same activity.  And Munt certainly

does not point to any specific examples of such similarly situated individuals.  As a

result, the Court concludes that the Amended Complaint does not state a class-based

equal protection claim.  The Court therefore recommends dismissing without prejudice

any such claims from this action.

### b.    Class-of-one equal protection claim

 This leaves Munt's class-of-one equal protection claim.  The Amended Complaint

does not refer to a class-of-one claim; Munt first brings up this sort of claim in his

response to the motion to dismiss.  (*See* Dkt. 71 at 27.)  As a threshold point, Defendants argue that this class-of-one theory is a "new allegation" that the Court should not consider.  (Dkt. 74 at 9 & n.4.)  The Court disagrees.  As Munt points out, "legal theories need not be alleged, only facts to support the claim."  (Dkt. 75 at 4.)  The Court agrees. *See, e.g.*, *Topchian*, 760 F.3d at 848 ("'The well-pleaded facts alleged in the complaint, not the legal theories of recovery or legal conclusions identified therein, must be viewed to determine whether the pleading party provided the necessary notice and thereby stated a claim in the manner contemplated by the federal rules.'") (quoting *Parkhill v. Minn. Mut. Life Ins. Co.*, 286 F.3d 1051, 1057-58 (8th Cir. 2002)).  As a result, the Court will address whether or not the Amended Complaint properly alleges a class-of-one equal protection claim.

The Supreme Court has stated that a plaintiff can allege an equal protection claim when she "alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment."  *Olech*, 528 U.S. at 564 (2000) (citing cases).  The Eighth Circuit has stated that "[t]o state a class-of-one claim, the plaintiff must . . . provide a specific and detailed account of the nature of the preferred treatment of the favored class, especially when the state actors exercise broad discretion to balance a number of legitimate considerations."  *Higgins Elec., Inc. v. O'Fallon Fire Prot. Dist.*, 813 F.3d 1124, 1129 (8th Cir. 2016) (quoting *Robbins v. Becker*, 794 F.3d 988, 996 (8th Cir. 2015) (cleaned up; ellipses in *Higgins*)).

Under the rules expressed in *Olech* and *Higgins*, a plaintiff bringing a class-of-one equal protection claim cannot rest on mere allegations of unequal treatment—as with

class-based equal-protection claims, the plaintiff must allege examples of similarly situated individuals who were treated differently. Here again the Amended Complaint falls short. Munt does not compare himself to any other specific similarly situated inmates, and nothing in the Amended Complaint resembles a "specific and detailed account of the nature of the preferred treatment of the favored class." For example, Munt alleges: "Defendants lacked a legitimate reason for treating Plaintiff differently and more adversely than other inmates. Desetelle and Parker often single Plaintiff for adverse action where they do not bother other inmates and fully approve of actions of their favorites." (Dkt. 15 at 11.) But there are no allegations as to how the "other inmates" and "favorites" are similarly situated and what makes their treatment preferred. Given these considerations, the Court recommends dismissing without prejudice Munt's class-of-one equal protection claim.

### 6.    Arguments Concerning § 1983 Liability

Defendants' next argument is that "even if this Court determines that Munt adequately pleaded any constitutional claims, this Court should still dismiss claims against some of the Defendants because Munt failed to allege facts to support their liability under [§] 1983." (Dkt. 43 at 13.) Defendants press two points here. First, they argue that Munt "fail[s] to allege sufficient personal involvement" by Defendants. (*See id.* at 13-14.) Second, they argue that Munt "fail[s] to allege sufficient facts to support official [capacity] claims against the Defendants." (*Id.* at 16-17.) The Court will address these arguments in turn.

### a.    Failure to allege sufficient personal involvement

Defendants' argument that Munt fails to sufficiently allege Defendants' personal involvement in depriving Munt of his constitutional rights has two subparts.  First, Defendants argue that Munt's claims against Defendants Schnell, Reishus, Wheeler, and Austreng "appears to be based on their general supervisory authority," which is insufficient to establish individual capacity liability under § 1983.  (*Id.* at 14-15.)

The Court agrees with Defendants.  "To state a claim against a supervisor, a plaintiff must show that the supervising official, through his own individual actions, violated the Constitution." *Morris v. Cradduck*, 954 F.3d 1055, 1060 (8th Cir. 2020) (citing *Iqbal*, 556 U.S. at 676).  For Defendants Schnell, Wheeler, and Austreng, the Amended Complaint's allegations do not suggest that these Defendants violated the Constitution.  The sum total of the factual allegations in the Amended Complaint against these three individuals are that Munt wrote to Schnell about his concerns about retaliatory treatment, and Wheeler and Austreng's investigation was not as thorough as Munt would prefer.  (*See* Dkt. 11 at 15-16.)  Nothing here suggests that these three individuals violated Munt's constitutional rights.[20]

As to Reishus, Munt alleges that when Reishus learned about Munt's communications with Schnell, his "response . . . was more insidious" and that he used

---

[20]    In his response to the Motion to Dismiss, Munt provides a litany of situations in which a supervisor may be held individually liable.  (Dkt. 71 at 24-25.)  Having reviewed that list and the Amended Complaint, the Court remains convinced that Munt's allegations against Schnell, Wheeler, and Austreng are far too conclusory to establish that Munt has adequately pleaded that any of these supervisory liability situations apply here.

"flaws in the system that are part of [Munt's] Suit #7 to frustrate [Munt's] use of the grievance process."  (Dkt. 11 at 16.)  This statement at least hints that Reishus may have been personally involved with some infringement of Munt's constitutional rights.  But Munt's allegation about Reishus is almost certainly just the sort of conclusory allegation that *Twombly* and *Iqbal* permit a district court to disregard when assessing a motion to dismiss.  Furthermore, even if this Court were to credit Munt's Reishus allegations, Suit #7's status dooms Munt's ability to pursue Reishus here.  As noted above (*see* note 10 *supra*), another court in this District has already dismissed that action with prejudice.  Given that outcome, not to mention Munt's failure to provide any specifics as to what about Suit #7 he thinks supports his claims, the Court cannot rely on any allegations based on Suit #7.

After considering these supervisory Defendants, the second subpart of Defendants' personal-involvement argument is a claim that Munt has failed to sufficiently allege the personal involvement of the remaining Defendants—i.e., Besonen, Desetelle, Mosser, Parker, and Witter.  (*See* Dkt. 43 at 15.)  The Court disagrees: as discussed above, the Amended Complaint contains sufficient specific allegations of how these five Defendants were personally involved in violations of Munt's constitutional rights.

###### b.    *Failure to allege sufficient facts for official capacity claims*

Defendants' second § 1983-based argument is that Munt has failed to "allege [that] he was injured by a specific DOC or prison policy or custom," and that as a result, "[b]ecause Munt has neither identified nor described any constitutional injury caused by a governmental policy or custom," the Amended Complaint cannot support any official

capacity liability.  (Dkt. 43 at 16-17.)  In response, Munt claims that the Amended

Complaint alleges "a custom of retaliation," a "practice of permitting constitutional

violations to go uncorrected," and a "custom of interfering with court access."  (Dkt. 71

at 35.)  He further contends that the Amended Complaint alleges that "these practices and

customs are system-wide."  (*Id.*)

      To bring an official capacity claim under § 1983, a plaintiff must allege that the

relevant governmental entity itself caused the relevant constitutional violation.  *See, e.g.*,

*Brewington v. Keener*, 902 F.3d 796, 801-02 (8th Cir. 2018) (quoting *City of Canton v.*

*Harris*, 489 U.S. 378, 385 (1989)); *Calhoun v. Washington Cty. Cmty. Servs. Child*

*Support Unit*, No. 18-CV-1881 (ECT/HB), 2019 WL 2079834, at *4 (D. Minn. Apr. 23,

2019) (citing *Bd. of Cty. Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 404 (1997)),

*R. &. R. adopted*, 2019 WL 2075870 (D. Minn. May 10, 2019).  A governmental entity's

liability can result from "(1) an official municipal policy, (2) an unofficial custom, or (3)

a deliberately indifferent failure to train or supervise."  *Jackson v. Stair*, 944 F.3d 704,

709 (8th Cir. 2019) (citing *Corwin v. City of Independence*, 829 F.3d 695, 699 (8th Cir.

2016)); *see also Calhoun*, 2019 WL 2079834, at *4 (same point (quoting *Atkinson v. City*

*of Mountain View*, 709 F.3d 1201, 1214 (8th Cir. 2013)).

      Munt's official capacity claims do not rest on any official policy or deliberately

indifferent failure to train or supervise.  (*See* Dkt. 71 at 35; *see also* Dkt. 11 at 11-12.)  As

a result, his official capacity claims must be based on an "unofficial custom."  The Eighth

Circuit has explained that:

> [A] plaintiff may establish municipal liability through an unofficial custom of the municipality by demonstrating (1) the existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees; (2) deliberate indifference to or tacit authorization of such conduct by the governmental entity's policymaking officials after notice to the officials of that misconduct; and (3) that plaintiff was injured by acts pursuant to the governmental entity's custom, i.e., that the custom was a moving force behind the constitutional violation.

*Brewington v. Keener*, 902 F.3d 796, 801 (8th Cir. 2018) (quoting *Corwin v. City of Independence*, 829 F.3d 695, 700 (8th Cir. 2016) (internal quotation marks and citation omitted)). Furthermore, "[t]he pattern of unconstitutional conduct must be so pervasive and widespread so 'as to have the effect and force of law.'" *Id.* (quoting *Andrews v. Fowler*, 98 F.3d 1069, 1075 (8th Cir. 1996)).

Munt's custom-based claim of official liability fails at the first element of the *Brewington* test: the Amended Complaint does not allege a "continuing, widespread, persistent pattern of unconstitutional misconduct." The Court understands that Munt asserts in various places that the relevant customs are "systemic." But he provides no factual allegations in support of this claim. At best, he provides allegations concerning individual problems that he has had with MNDOC staff. He provides no factual allegations whatsoever about any other individuals' similar problems, much less any allegations plausibly pointing to a systemwide custom of wrongdoing. This means that Munt's allegations of a "systemic" custom are precisely the sort of "'formulaic recitation'" that a district court need not accept as true when considering a motion to dismiss. *See Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555).

As a result, the Court recommends dismissing without prejudice the Amended Complaint's official capacity claims.

### 7.    Arguments Concerning Relief Entitlement

Defendants next contend that Munt is not able to claim certain sorts of relief. First, Defendants argue that the Eleventh Amendment and/or § 1983 bar any damages claim against Defendants in their official capacities. (*See* Dkt. 43 at 17-18.) Next, Defendants contend that Munt "cannot recover injunctive relief against Defendants in their individual capacities." (*Id.* at 18.) Defendants' third argument is that the Amended Complaint fails to allege facts permitting punitive damages. (*See id.* at 19.) Finally, Defendants offer additional reasons why Munt's requests for injunctive relief are improper. (*See id.* at 19-20.)

#### a.    *Official capacity claims for damages*

Defendants argue that this Court should dismiss Munt's official capacity claims for damages because of the Eleventh Amendment as well as limits on § 1983 liability. (*See id.* at 17-18.) Munt calls this argument "frivolous or malicious," pointing to the Amended Complaint's statement that "[d]amages are sought against Defendants in their individual capacities." (Dkt. 71 at 36 (quoting Dkt. 11 at 4).) Given Munt's concession, and this Court's earlier determination that the Amended Complaint fails to state any official capacity claims, the Court considers this issue moot.

#### b.    *Individual capacity claims for injunctive relief*

Defendants contend that this Court should dismiss any claims for injunctive relief targeting Defendants in their individual capacities. (*See* Dkt. 43 at 18.) Munt again calls

this argument "frivolous or malicious," saying that "the complaint clearly states that '[i]njunctive relief is sought against Defendants in their official capacities.'"  (Dkt. 71 at 36 (quoting Dkt. 11 at 4).)  He then suggests that he now believes that it is proper to bring injunctive relief claims against individuals in their individual capacities, and indicates that he thus plans to amend the Amended Complaint "to seek restraining orders" against Besonsen, Desetelle, Mosser, Parker, and Witter in "both/either capacity."  (*Id.* at 36-37.)

The Court interprets these statements as an admission by Munt that the Amended Complaint does not seek injunctive relief from any Defendants in their individual capacities.  This admission makes Defendants' argument moot.  The Court need not address now whether a future amended pleading could properly press claims for injunctive relief against Defendants in their individual capacities.

### c.    *Punitive damages*

The Amended Complaint seeks $1 million in punitive damages.  (*See* Dkt. 11 at 27.)  The Eighth Circuit has stated that "[p]unitive damages may be awarded under 42 U.S.C. § 1983 when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others."  *Fletcher v. Tomlinson*, 895 F.3d 1010, 1024 (8th Cir. 2018) (quoting *Schaub v. VonWald*, 638 F.3d 905, 922 (8th Cir. 2011) (cleaned up)).  The Eighth Circuit has also indicated that whether "a defendant's conduct was motivated by an evil motive or involves reckless indifference to the federally protected rights of others" is a fact question.  *Id.* (quoting *Schaub*, 638 F.3d at 923 (cleaned up)).  Given this legal

framework and the Amended Complaint's allegations, the Court will not recommend dismissal of Munt's punitive damages claim at this time.

### d.    *Arguments against requested injunctive relief*

Defendants raise two additional arguments that purportedly establish that Munt cannot obtain the injunctive relief sought in the Amended Complaint.  The first argument is that "request for injunctive relief against state officials in federal court needs to be connected to an ongoing violation of federal law."  (Dkt. 43 at 19 (citing *Green v. Mansour*, 474 U.S. 64, 68 (1985).)  The second is that the injunctive relief Munt seeks is barred by the Prison Litigation Reform Act, which sets certain limits on the "prospective relief" a plaintiff can obtain "in any civil action with respect to prison conditions."  (*Id.* at 20.)

Given the Court's previous conclusions, it need not delve into these issues.  The Court has already recommended dismissing any official capacity claims in this action for failure to state a claim, and Munt appears to concede that the Amended Complaint does not seek injunctive relief against any Defendants in their individual capacities.  Considered together, these points mean that, if this Court's recommendation concerning the Amended Complaint's official capacity claims is accepted, no requests for injunctive relief will remain in this action.  This moots any need to address Defendants' additional arguments about Munt's requests for injunctive relief.

### 8.    **Qualified Immunity**

The final argument in Defendants' Motion to Dismiss is a claim that qualified immunity should apply to Munt's individual capacity claims.  (*See* Dkt. 20-21.)  Munt

disagrees.  (*See* Dkt. 71 at 41-46.)  The Supreme Court recently laid out qualified

immunity's parameters as follows:

> Under our precedents, officers are entitled to qualified immunity under §
> 1983 unless (1) they violated a federal statutory or constitutional right, and
> (2) the unlawfulness of their conduct was "clearly established at the time."
> "Clearly established" means that, at the time of the officer's conduct, the law
> was "'sufficiently clear' that every 'reasonable official would understand that
> what he is doing'" is unlawful.  In other words, existing law must have placed
> the constitutionality of the officer's conduct "beyond debate."    This
> demanding standard protects "all but the plainly incompetent or those who
> knowingly violate the law."
>
> To be clearly established, a legal principle must have a sufficiently clear
> foundation in then-existing precedent.  The rule must be "settled law," which
> means it is dictated by "controlling authority" or "a robust 'consensus of
> cases of persuasive authority.'"  It is not enough that the rule is suggested by
> then-existing precedent.  The precedent must be clear enough that every
> reasonable official would interpret it to establish the particular rule the
> plaintiff seeks to apply.  Otherwise, the rule is not one that "every reasonable
> official" would know.
>
> The "clearly established" standard also requires that the legal principle
> clearly prohibit the officer's conduct in the particular circumstances before
> him. The rule's contours must be so well defined that it is "clear to a
> reasonable officer that his conduct was unlawful in the situation he
> confronted."  This requires a high "degree of specificity."  We have
> repeatedly stressed that courts must not "define clearly established law at a
> high level of generality, since doing so avoids the crucial question whether
> the official acted reasonably in the particular circumstances that he or she
> faced."  A rule is too general if the unlawfulness of the officer's conduct
> "does not follow immediately from the conclusion that [the rule] was firmly
> established." . . . .

*D.C. v. Wesby*, 138 S. Ct. 577, 589-90 (2018) (internal citations omitted).

Before the Court considers qualified immunity, it will take stock of what claims

remain in this action.  Under the above analysis, the only claims that remain are

individual capacity claims against Besonen, Desetelle, Mosser, Parker, and Witter; the

remaining causes of action are First Amendment retaliation claims and claims that these individuals conspired to infringe on Munt's constitutional rights in violation of § 1983.

Defendants appear to challenge both qualified immunity elements—that is, they claim that Munt has failed to allege that Defendants "violated a federal statutory and constitutional right," and that the unlawfulness of Defendants' conduct was "clearly established at the time."  For the reasons discussed above, the Court believes that, as to the claims remaining in this action, Munt has sufficiently alleged that the remaining Defendants violated his constitutional rights.  This key qualified immunity issue is thus whether Defendants' alleged conduct as to the remaining claims was "clearly established" as being unlawful.

The Court concludes that it is clearly established that prison staff may not retaliate against prisoners for exercising their First Amendment rights, e.g., their rights to file grievances and lawsuits.  *See, e.g.*, *Spencer*, 738 F.3d at 912 ("An inmate has a First Amendment right to use prison grievance procedures, and it has been established in our circuit 'for over twenty years' that retaliatory actions for filing a prison grievance are actionable.") (quoting *Nelson v. Shuffman*, 603 F.3d 439, 449-50 (8th Cir. 2010)); *Santiago*, 707 F.3d at 994 ("A prisoner has the right under the First Amendment to petition for redress of grievances under a prison's grievance procedures and conduct that retaliates against the exercise of a constitutionally protected right . . . is actionable even if the alleged retaliatory conduct does not itself rise to the level of a constitutional

violation.") (quoting cases; cleaned up)).[21]  Given this caselaw and the Amended

Complaint's allegations, the Court believes that if Munt's allegations are true, any

reasonable officer in Defendants' positions would know that their actions were unlawful.

The Court thus recommends that qualified immunity not be applied to the remaining

Defendants at this stage of the proceeding.

### G.    Requests for Temporary Restraining Orders and/or Preliminary Injunctions

With the Motion to Dismiss analyzed—and certain claims remaining for

discovery—the Court must address Munt's various motions seeking TROs or preliminary

injunctive relief: the TRO Motion, TRO Supplement, and the Amended TRO Motion.

The first two can be resolved easily: as discussed above, the Amended TRO Motion

supersedes the TRO Motion (which itself was modified by the TRO Supplement).  This

means that the TRO Motion and TRO Supplement are now moot.  The Court therefore

recommends denying both the TRO Motion and the TRO Supplement.

This leaves the Amended TRO Motion.  As a threshold matter, the Court notes

that, after Defendants responded to the Amended TRO Motion, Munt has complained that

he "object[s] to the Court treating [the Amended TRO Motion] as a preliminary relief

---

[21]     To be sure, *Spencer*'s and *Santiago*'s fact patterns differ from the one here.  *See Spencer*, 738 F.3d at 909-11 (presenting facts of Spencer's case); *Santiago*, 707 F.3d at 987-89 (presenting facts of Santiago's case).  But "[f]or a right to be clearly established, it is not required that there be 'a case directly on point.'"  *Z.J. v. Kansas City Bd. of Police Comm'rs*, 931 F.3d 672, 685 (8th Cir. 2019) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)).  On the contrary, "[a]n officer may have fair notice based on the fact that his conduct is obviously unlawful, even in the absence of a case addressing the particular violation."  *Id.* (citing *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)).

request." (Dkt. 61 at 2.)  The idea here is that the Court has somehow erred by permitting Defendants to respond to the Amended TRO Motion.

The Court perceives no error here.  Indeed, Munt himself has made similar arguments in litigation in this District before, and had them rejected for reasons this Court finds persuasive.  *See* Mem. Op. & Order 3-6, *Munt v. Minn. Dep't of Corrs.*, No. 16-CV-1206 (SRN/SER) (D. Minn. Oct. 20, 2016).  In that litigation, after a magistrate judge permitted the defendants to respond to a TRO motion filed by Munt, Munt complained in objections that, essentially, "his motion for TRO should have been heard ex parte and without delay."  *Id.* at 3.

The Court disagreed, and much of the discussion there applies here in full:

First, a TRO is not a matter of right—its issuance is subject to the sound discretion of the court.  As part of this discretion, courts are tasked with protecting not only the interests of the plaintiff, who claims that he is faced with the possibility of irreparable injury, but also those of the defendant, who may be subject to restraint without notice or an opportunity to respond. Balancing these competing interests requires the court to consider whether an ex parte motion is truly necessary in light of the facts of the case, or whether a delay may be permitted in order to allow the defendant to participate.  As a general matter, courts answer this question with the presumption that issuance of a TRO—as opposed to other relief—is heavily disfavored.

Building upon this preference, it is well settled that where the defendant has received notice—through whatever means—of the motion, a court may exercise its inherent power to convert the motion from one for a TRO into one for a preliminary injunction.

*Id.* at 3-5 (citations omitted).  This Court finds this analysis—of which Munt is fully aware—cogent and persuasive.

In this action, Defendants were aware that Munt was seeking expansive and immediate injunctive relief: Munt's own Amended Complaint contained that request (as discussed above), and when Munt filed the Amended TRO Motion, Defendants had already been served with the Amended Complaint. Defendants were thus on notice that Munt was seeking just the sort of relief requested by the Amended TRO Motion. When this happened in Munt's earlier litigation, "[a]t that point, considerations of equity mandated that the magistrate judge treat Munt's [motion] for ex parte relief as one allowing both parties to be heard." *Id.* (citing *Planned Parenthood of Wis., Inc. v. Van Hollen*, 963 F. Supp. 2d 858, 864-65 (W.D. Wis. 2013)). The same result applies here. The Court sees no error in having permitted Defendants to respond to the Amended TRO Motion.[22]

Given that the Court is not ruling on Munt's Amended TRO Motion ex parte, the Court shall treat the Amended TRO Motion as one for a preliminary injunction instead. "When determining whether to issue a preliminary injunction, [a] district court should consider '(1) the threat of irreparable harm to the movant; (2) the state of balance between this harm and the injury that granting the injunction will inflict on other parties litigant [sic]; (3) the probability that movant will succeed on the merits; and (4) the public

---

[22] The Court acknowledges that in Munt's earlier litigation, Munt's TRO request faced an additional problem: he had failed to comply with Rule 65(b)(1)(B)'s requirement of explaining the steps taken to give notice or explain why notice is unnecessary. Munt does not face that problem here: his affidavit in support of the Amended TRO Motion does purport to cover the Rule 65(b)(1)(B) requirement. But in reviewing the analysis from Munt's earlier case, this Court finds that analysis persuasive here notwithstanding this factual difference between the cases.

interest.'" *Jet Midwest Int'l Co., Ltd. v. Jet Midwest Grp., LLC*, 953 F.3d 1041, 1044 (8th Cir. 2020) (quoting *Dataphase Sys., Inc. v. CL Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981) (en banc)).  The district court should balance all of these factors to determine whether to issue an injunction; no single factor decides the question.  *See, e.g.*, *Lankford v. Sherman*, 451 F.3d 496, 503 (8th Cir. 2006) (citing *Baker Elec. Co-op, Inc. v. Chaske*, 28 F.3d 1466, 1472 (8th Cir. 1994)).  The party seeking injunctive relief—here, Munt— has the burden of establishing these factors.  *See, e.g.*, *id.* (citing *Watkins, Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003)).

Defendants and Munt disagree as to the applicability of all four *Dataphase* factors. (*Compare* Dkt. 25 at 8-14, *with* Dkt. 41 at 5-14.)  The Court will consider each in turn.

### 1.    Irreparable Harm

For purposes of justifying a preliminary injunction, "'[i]rreparable harm occurs when a party has no adequate remedy at law, typically because its injuries cannot be fully compensated through an award of damages.'" *Phyllis Schlafly Revocable Tr. v. Cori*, 924 F.3d 1004, 1009 (8th Cir. 2019) (quoting *Gen. Motors Corp. v. Harry Brown's, LLC*, 563 F.3d 312, 319 (8th Cir. 2009)).  And it is well established that "[t]he loss of First Amendment freedoms constitutes irreparable injury." *Powell v. Ryan*, 899, 904 (8th Cir. 2017) (citing *Johnson v. Minneapolis Park & Recreation Bd.*, 729 F.3d 1094, 1101–02 (8th Cir. 2013)).

Here, Munt contends that if injunctive relief does not go into effect, his ability to pursue his legal claims in this case (and others) will be undercut—specifically, by Parker and Mosser being able to continue (allegedly) intimidating potential witnesses.  The

Court concludes that Munt has suggested that irreparable harm could occur if no injunctive relief is implemented.  This factor favors Munt.

### 2.    Balance of Harms and Public Interest

The balance-of-harms factor and the public-interest factor are separate *Dataphase* factors.  The Eighth Circuit has indicated, however, that when public governmental entities are the potential target of an injunction, the two factors "to some extent . . . are connected."  *Glenwood Bridge, Inc. v. City of Minneapolis*, 940 F.2d 367, 372 (8th Cir. 1991).  The Court will therefore consider these two factors together.

With respect to the balancing of the harms, courts in this District indicate that analyzing this factor "involves assessing the harm the movant would suffer absent an injunction, as well as the harm other interested parties would experience if the injunction issued."  *Pavek v. Simon*, No. 19-CV-3000 (SRN/DTS), 2020 WL 3183249, at *27 (D. Minn. June 15, 2020) (citing *Mainstream Fashions Franchising, Inc. v. All These Things, LLC*, No. 19-CV-2953 (SRN/TNL), 2020 WL 1812501, at *26 (D. Minn. Apr. 9, 2020)).  This assessment requires the Court to "'flexibly weigh the case's particular circumstances to determine whether justice requires the court to intervene to preserve the status quo.'"  *Id.* (quoting *Wood v. Kapustin*, No. 13-CV-1495 (DSD/AJB), 2013 WL 3833981, at *4 (D. Minn. July 23, 2013) (cleaned up)).

As for the public-interest factor, the Court notes a pair of considerations that guide its analysis here.  First, the Eighth Circuit has noted the importance of comity between the federal courts and state governments: "'Few public interests have a higher claim upon the discretion of a federal chancellor than the avoidance of needless friction with state

policies.'" *Dixon v. City of St. Louis*, 950 F.3d 1052, 1056 (8th Cir. 2020) (quoting *R.R. Comm'n of Tex. v. Pullman Co.*, 312 U.S. 496, 500 (1941)); *see also id.* (quoting *Rizzo v. Goode*, 423 U.S. 362, 378 (1976), for proposition that "[w]here . . . the exercise of authority by state officials is attacked, federal courts must be constantly mindful of the special delicacy of the adjustment to be preserved between federal equitable power and State administration of its own law").

Second, numerous courts stress the principles that courts should be very wary of imposing injunctive relief in the prison context. *See, e.g.*, *Goff v. Harper*, 60 F.3d 518, 520 (8th Cir. 1995) ("[I]n the prison context, a request for injunctive relief must always be viewed with great caution because 'judicial restraint is especially called for in dealing with the complex and intractable problems of prison administration.'") (quoting *Rogers v. Scurr*, 676 F.2d 1211, 1214 (8th Cir. 1982)); *O'Malley v. Birkholz*, No. 20-CV-0660 (ECT/TNL), 2020 WL 3064722, at *1 (D. Minn. May 13, 2020) (quoting *Goff*), *R. & R. adopted*, 2020 WL 3062183 (D. Minn. June 9, 2020).

In the present case, if the Court were to grant the wide-ranging relief that the Amended TRO Motion seeks, that would significantly intrude on the State of Minnesota's ability to manage its own affairs, and would do so in the particularly sensitive area of prison management. These two factors favor denying the Amended TRO Motion.

### 3.    Likelihood of Success on the Merits

The last factor to consider is Munt's likelihood of success on the merits of his claims. This factor "'has been referred to as the most important of the [*Dataphase*]

factors.'" *Jet Midwest Int'l Co., Ltd v. Jet Midwest Grp., LLC*, 953 F.3d 1041, 1044 (8th Cir. 2020) (quoting *Roudachevski v. All-Am. Care Centers, Inc.*, 648 F.3d 701, 706 (8th Cir. 2011 (brackets in *Jet Midwest*)).  When considering the likelihood of success on the merits, a movant need only show a "'fair chance of prevailing.'"  *Id.* at 1045 (quoting *Planned Parenthood Minn., N. Dakota, S. Dakota v. Rounds*, 530 F.3d 724, 732 (8th Cir. 2008).  Furthermore, the movant need only "'establish a likelihood of succeeding on the merits of any one of [its] claims.'"  *Richland/Wilkin Joint Powers Auth. v. U.S. Army Corps of Eng'rs*, 826 F.3d 1030, 1040 (8th Cir. 2016) (quoting *Am. Rivers v. U.S. Army Corps of Eng'rs*, 271 F. Supp.2d 230, 250 (D.D.C. 2003)).

This factor favors denying the Amended TRO Motion.  Munt's litigation history inspires little confidence that he can ultimately prevail in this litigation, and to date, the only evidence Munt has submitted in support of his requests for preliminary injunctive relief are his own affidavits than any other evidence supporting his claims of retaliation.

Looking holistically at all four *Dataphase* factors, the Court recommends denying the Amended TRO Motion.  While the irreparable harm factor favors granting a preliminary injunction, the remaining factors do not, and the Court is particularly concerned that Munt's expansive requests for relief, if granted, would needlessly impede Minnesota's administration of its criminal justice system.

# ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1.  Plaintiff Joel Marvin Munt's Motion to Accept Amendment (Dkt. 36) is **DENIED**;

2.  Plaintiff's filing titled "Request for Court Actions #2" (Dkt. 67) is **DENIED** to the extent it seeks a stay; and

3.  Plaintiff's motion to strike Defendants' reply in support of the Motion to Dismiss (Dkt. 75) is **DENIED**.

# RECOMMENDATION

Based on the foregoing, and on all of the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1.  Plaintiff's filing titled "Requests of the Court" (Dkt. 56) be **DENIED** to the extent it asks the Court to impose sanctions on Defendants.

2.  Plaintiff's filing titled "Request for Court Actions #2" (Dkt. 67) be **DENIED** to the extent it asks the Court to impose sanctions on Defendants.

3.  Plaintiff's filing titled "Motion for Sanctions #2" (Dkt. 77) be **DENIED**.

4.  Defendants' motion to dismiss (Dkt. 42) be **GRANTED** in the following respects:

    a.  The Amended Complaint's claims against Defendants Paul Schnell, David Reishus, Sherlinda Wheeler, and Bronson

Austreng should be **DISMISSED WITHOUT PREJUDICE**;

b.    The Amended Complaint's claims that Defendants violated 42 U.S.C. § 1985(3) should be **DISMISSED WITH PREJUDICE**;

c.    The Amended Complaint's claims based on the Fourteenth Amendment's Equal Protection Clause should be **DISMISSED WITHOUT PREJUDICE**; and

d.    The Amended Complaint's official capacity claims should be **DISMISSED WITHOUT PREJUDICE.**

5.    In all other respects, Defendants' motion to dismiss be **DENIED**.

6.    Plaintiff's filing titled "Supplement to TRO Request" (Dkt. 20); Plaintiff's First Motion for Expedited Temporary Restraining Order Pursuant to Fed. R. Civ. P. 65(b) (Dkt. 22); and Plaintiff's Amended First Motion for Expedited Temporary Restraining Order Pursuant to Fed. R. Civ. P. 65(b) (Dkt. 25) be **DENIED**.

Dated: July 31, 2020                    *s/Elizabeth Cowan Wright*
                                        ELIZABETH COWAN WRIGHT
                                        United States Magistrate Judge

## NOTICE

**Filing Objections:**  This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation.  A party may respond to those objections within 14 days after being served a copy of the objections.  *See* Local Rule 72.2(b)(2).  All objections and responses must comply with the word or line limits set forth in Local Rule 72.2(c).